# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sharon Urbia,                                   Civil No. 04-3739 (RHK/SRN)

      Plaintiff,

      v.                                   <u>REPORT AND RECOMMENDATION</u>

Jo Anne B. Barnhart,
Commissioner of Social Security,

      Defendant.

_____

Lionel H. Peabody, Esq., on behalf of Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, on behalf of Defendant

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g) (2000), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security (Commissioner), who determined that Plaintiff was not statutorily disabled and therefore not entitled to disability insurance benefits under Title II of the Social Security Act, the relevant portion of which is codified at 42 U.S.C. § § 416(i), 423.

      The parties have submitted cross motions for summary judgment. (Doc. Nos. 17, 22.) Plaintiff also moves the Court for leave to file more pages in support of its motion than allowed by District of Minnesota Local Rule 7.1. (Doc. No. 25.) The matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c).

      For the reasons set forth below, this Court recommends that Defendant's Motion for Summary

Judgment (Doc. No. 22) be denied.  The Court also recommends that Plaintiff's Motion for Summary

Judgment be granted (Doc. No. 17), the decision of the Commissioner be reversed, and the matter be

remanded for entry of an award of benefits for Plaintiff.

## I.    BACKGROUND

### A.    <u>Procedural Posture</u>

Plaintiff Sharon Urbia (Urbia) was last insured for Social Security Disability Benefits on

December 31, 1984 (also identified herein as her date last insured or DLI).  (<u>See</u> R. at 116, 119.)  On

May 4, 1998, Urbia filed an application for disability insurance benefits stating that she became

disabled on October 31, 1979.  (R. at 105–08.)  Her application was denied on initial review in July of

1998 (R. at 35) and upon reconsideration in October of 1998 (R. at 36).  On November 27, 1998,

Urbia timely filed a request for a hearing before an Administrative Law Judge (ALJ).  (R. at 73.)  On

September 16, 1999, a hearing was held before ALJ Robert C. Cordek.  (R. at 40.)  On December

28, 1999, ALJ Cordek issued an opinion in which he found Urbia, through her date last insured, unable

to perform her past work but capable of performing a significant number of jobs in the national

economy.  (R. at 53.)  As a result, the ALJ determined that Urbia was not disabled as defined in the

Social Security regulations and not entitled to benefits.  (R. 40-41.)

Urbia then appealed ALJ Cordek's decision to the Social Security Appeals Council (Appeals

Council).  (R. at 90-92.)  On May 17, 2002, the Appeals Council remanded the decision to a different

ALJ for further findings.  (R. at 93.)  A second hearing was held, this time before ALJ Mary M. Kunz.

(R. at 668.)  On February 25, 2003, ALJ Kunz issued her decision in which she found that Urbia

retained the ability, through her DLI, to perform her past relevant work as a legal secretary, secretary,

and children's librarian.  (R. at 32.)

Urbia again sought review by the Appeals Council, this time of ALJ Kunz's decision.  (See R.

at 12.)  On April 30, 2004, the Appeals Council denied her request for review.  (R. at 12-14.)  Upon

denial of her request for review by the Appeals Council, the ALJ's decision became the final decision

of the Commissioner of Social Security and subject to judicial review.  See 42 U.S.C. § 405(g).  On

August 9, 2004, Urbia filed the action now before this Court.  (Doc. No. 1.)  The parties filed cross

motions for summary judgment (Doc. Nos. 17, 22) with accompanying memoranda.  Urbia also filed a

Motion for Leave to File Excess Pages (Doc. No. 25)[1] and an accompanying reply brief.  Urbia moves

the Court for an Order reversing the Commissioner's decision and awarding her benefits.  (Doc. No.

19.)  Defendant moves for summary judgment affirming the ALJ's decision.  (Doc. No. 23.)

**B.     Factual Background**

Urbia was born in 1950, making her twenty-nine on her alleged date of onset, thirty-four years

old on her date last insured, and fifty-two on the day ALJ Kunz issued her opinion.  (See R. at 106.)

Urbia graduated from high school in 1968 and enrolled in a two-year secretarial program at a

community college.  (R. at 133, 673.)  After completing her program, she worked full-time as a

secretary and a legal secretary from 1971 to 1975.  (R. at 674-76, 721.)  She then attended a court

reporter school full-time for another two years, from 1975 to 1977.  (R. at 133, 676.)  During her time

at the court reporter school, Urbia worked part-time babysitting, house sitting, and dog sitting, and

finally, as a library aide.  (R. at 676-670.)  In October of 1978, Urbia took a full-time position as a

---

[1] The accompanying proposed brief has already been filed (Doc. No. 27).  Given the length of the administrative record and the lack of any opposition by the Commissioner, the Court grants Urbia's Motion for Leave to File Excess Pages (Doc. No. 25).

children's librarian.  (R. 617, 701-02.)

On August 14, 1979, Urbia developed a sore throat and flu-like symptoms.  (R. at 130, 702.)
About this time and while still employed as a children's librarian, Urbia also took a five-credit course in
children's literature, was caring for a mentally handicapped child, and, on September 1, 1979, got
married.  (R. at 702-03.)  Urbia claims her illness persisted and worsened, leaving her hoarse, unable
to speak, subject to "really, really bad headaches," and generally weak.  (R. at 702-03.)  She claims
the illness was the reason she quit her library job on October 31, 1979.  (R. at 130, 702.)  Urbia has
not worked since quitting her library position.  (R. at 130, 133.)

### 1.   Urbia's Medical Records

#### a.   Through Date Last Insured (December 31, 1984)

The first medical record for Urbia in evidence is dated September 25, 1979.  (R. at 328.)  On
that date, Urbia was examined by Dr. Gulshan Sahni on referral from Dr. Jack Greene.  (Id.)
According to Dr. Sahni, Urbia complained of "having hoarseness for about a month."  (Id.)  Dr. Sahni
reported that her vocal cords were mobile and had no polyp or lesion and that he told Urbia she had no
serious problem in her larynx.  (Id.)  Dr. Sahni stated that Urbia "became very emotional and had an
out burst of crying and was very hard to convince that she ha[d] no serious problem in her larynx."
(Id.)

On October 24, 1979, Urbia was examined by Dr. Greene.  (R. at 323.)  Dr. Greene's
handwritten notes indicate, "sore throat. hoarse voice."  (Id.)  Dr. Greene's diagnosis was
"pharyngitis."  (Id.)  Dr. Greene's notes indicate that a test to rule out strep throat was administered, he
prescribed medication, and scheduled a follow up appointment for one week later.  (Id.)

4

On November 21, 1979, Urbia was examined by Dr. F.L. Mast who diagnosed her as having

an upper respiratory infection with pharyngitis and prescribed "penicillin plus symptomatic treatment"

and told her to follow up as needed.  (R. at 327.)  Dr. Mast also noted that Urbia, who is five feet tall

(R. at 405-06, 458), weighed 116 pounds (R. at 327).  On December 19, 1979, Dr. Mast again saw

Urbia and this time noted, "This lady has recurrent pharyngitis.  Instructed in symptomatic care.  1:2

C.R. penicillin."  (R. at 327.)  He instructed Urbia to follow up as needed.  (Id.)  Urbia went to Dr.

Mast again on January 16, 1980.  (Id.)  Dr. Mast recorded:

> Recurrent pharyngitis.  Now again has an acute sore throat.  Throat culture obtained to
> [rule out] Strep.  Mono. testing also shows POSITIVE reaction.  She does have 11%
> eosinophilia suggesting some allergic response.  Presently will have 1:2 C.R. penicillin and
> return on the 25th for outpatient 1:2 L.A. Bicillin and on rest at home.  Return here 1st
> week in February for [follow] up Mono.

(Id.)  Urbia apparently returned on January 25, 1980 for the Bicillin; her chart for that day reads, "1:2

L.A. Bicillin."  (Id.)  On February 8, 1980, Urbia did follow up with Dr. Mast as he had recommended.

Dr. Mast's notes for the examination state, "Follow-up of Inf. mono plus treatment of chronic pustular

acne. . . . Continued symptomatic observation of Mono."  (Id.)  On March 25, 1980, Dr. Mast again

saw Urbia and indicated, "F[ollow] up to Mono. Symptomatically improved and blood differential is

likewise improved.  Continue symptomatic Rx with increasing activity as tolerated."  (Id.)  On June 30,

1980, Dr. Mast again examined Urbia and noted: "Respiratory infection with pharyngitis and some

early bronchitis.  1.2 CR penicillin plus Drixoral 1 [twice a day].  Return for f[ollow] up on Wednesday.

(Id.)  Urbia returned as requested on July 2, 1980, and Dr. Mast indicated "F[ollow] up to the above.

She still is having considerable chest congestion and productive mucous and febrile [i.e., fever]

response.  E-mycin 250 mg. 1 [four times per day] added to the above plus Tussi-organidin

5

expectorant.  Return for f[ollow] up."  (Id.)  Urbia again returned as requested, and, on July 8, 1980,

Dr. Mast's notes read, "F[ollow] up to the above.  Now symptomatically much improved and advised

in continued symptomatic observation."  (Id.)  On August 25, 1980, Dr. Mast examined Urbia.  (R. at

326.)  Dr. Mast's notes of the examination are as follows: "Respiratory infection with pharyngitis and

some mild vertigo.  She also has definite laryngitis.  Throat culture obtained.  Placed on E-mycin 250

[four times a day]; Dimetapp 1 tablet [twice a day] and advised to return for laryngoscopy if not

promptly improved."  (Id.)  Dr. Mast next saw Urbia on September 12, 1980 and noted, "Respiratory

infection with persistent laryngitis.  Vibramycin 100 mg. [twice a day] plus Tussi-organidin expectorant.

To have laryngoscopy by Dr. Muller to [rule out] larynx disease."  (Id.)

On September 16, 1980, Urbia underwent a laryngoscopy performed by Dr. Muller.  (R. at

325.)  Dr. Muller noted the following in Urbia's record:

> [Patient] very nervous but says she came to be examined for hoarseness.  She says her
> hoarseness [and] sore throat not associated [with] nervousness but she does have
> occasional dysphagia [i.e., difficulty swallowing] which sounds like globus [hystericus, i.e.,
> the sensation of having something in the throat when nothing is there] which is associated
> [with] nervousness.  Exam of vocal cords [and] pharynx normal.

(Id.)  Dr. Muller's impression was "allergy, spasm [and] anxiety"; Dr. Muller prescription: "Relax, Rest

voice, no booze, no tobacco, avoid . . . spiced foods."  (Id.)

In September 25, 1980, Urbia was examined by Dr. F.J. Swenson for a gynecological exam.

(Id.)  Dr. Swenson diagnosed Urbia with a urinary tract infection and reported that "abdominal exam

reveals pelvic tenderness in both adnexal areas and the suprapubic area.  Pelvic exam reveals

tenderness of her bladder, otherwise the pelvic area is pretty much free of any abnormalities."  (Id.)

Dr. Swenson listed Urbia's weight as 117 pounds.  (Id.)

On November 3, 1980, Urbia returned to Dr. Mast and after an examination Dr. Mast noted, "Recurrent pharyngitis. E-mycin 250, 1 [four times daily] for 10 days." (R. at 324.) Handwritten on the day's record is, "T[hroat] C[ulture] Neg." (Id.) Urbia returned to Dr. Mast on November 10, 1980 and the record reads:

> This young lady is seen with a complaint of difficulty breathing and she actually at this time does seem to be hyperventilating and with cardiac pulmonary ausculation. She does seem somewhat weak and whoozy consistent with hyperventilation. Chest x-ray to rule-out spontaneous pneumo and other pathology. Advised in symptomatic care and f[ollow] up. To use 1/4 gr. Pheno-barb [as needed] for the anxiety.

(Id.) Two months later, on January 19, 1981, Dr. Mast again examined Urbia and noted, "Respiratory infection with pharyngitis. Throat culture pending. Sudafed Plus, 1 [every] 4 hr. pending culture result." (Id.) A handwritten notation below Dr. Mast's comments indicates, "T[hroat] C[ulture] Neg." (Id.)

Sometime before May 6, 1981, Dr. Swenson examined Urbia again; the records indicate "Continuation of pyoderma [i.e, skin infection]. Rx for Tetracyclene, 1 [twice a day]. Actifed 1 tab. as needed for respiratory congestion. Considerable discussion of multiple tension related factors." (Id.) On May 6, 1981, Dr. Swenson examined Urbia and reported, "Has eustach[]itis with popping and noises in her ears, slight dizziness etc. . . . . Actifed. Return if necessary." (Id.) Urbia returned to Dr. Swenson on May 13, 1981. (Id.) The record of the examination states:

> In for consultation reporting that she does not feel well having a 15 lb. weight loss during the past 1 ½ to 2 yrs. Her appetite is fairly good, sleeps ok. She has had recurring respiratory infections since she had Inf. Mono. 1 ½ yrs. ago. She is a non smoker, has some sore throat now and ear distress. She feels at about 80% of capacity most of the time. She also has some shortness of breath and occasional bloody discharge from the nose.
> 
> Head is normal. E.E.N.T. appear normal. Throat is somewhat reddened and Strept. screen was made. Neck is normal.
> 
> Chest: Clear to P and A. Heart. Normal. Abdominal exam reveals mild

7

tenderness in epigastrium and in the lower abdominal area.  Note pelvic exam last fall was normal.  Liver was felt 2-3 finger breadths below the right costal margin.  Spleen was not felt.  Etiology of her complaints not certain but I think other testing ought to be done including sinus x-rays, chemistry profile, CBC, sed. rate, another urinalysis, [an immunofluorescent antinuclear antibody test or (FANA)], rheumatoid tests.  She will return for those and then report back to me.

(Id.)  The results of a May 14, 1981 chemistry profile test showed that Urbia's glucose and calcium levels were lower than the "normal" range indicated for those substances.  (R. at 341.)  On May 21, 1981, Urbia saw Dr. Swenson who recorded the events as follows:

Laboratory studies are all normal.  There is some question whether she has residual illness from her Inf. Mono. of about 15-16 mo. ago.  Exploring that thought, we will go ahead with another Mono. spot, heterophile [and] antibody titre, and if the heterophile antibody titre is negative, then to get Epstein Barr antibody studies at the Mayo Clinic.  Specimen was drawn today.  It will be about 3 wks. before we get reports.

(R. at 300.)  The Mayo Medical Laboratory reported the Epstein Barr Virus test results on May 29, 1981.  (R. at 338.)  The test results indicated that Urbia was infected with EBV "in past (at least 2-6 months ago)."  (Id.)

Between the May 29, 1981 lab report and July 15, 1982, it appears that the only medical observations of Urbia in the record are notations of Dr. Swenson refilling Tetracycline prescriptions for Urbia in August and November of 1981 and May 1982.  (R. at 300).  On July 15, 1982, Urbia was examined by Dr. Greene.  (R. at 323.)  The record indicates, "Sore throat," which apparently is what Urbia reported.  (Id.)  Dr. Greene wrote, "Laryngitis, Rhinitis [i.e., inflamation of the nasal mucous membrane]" and prescribed "Ornade [at bedtime]" and "sudafed during day [as needed]."  (Id.)  Dr. Greene listed Urbia's weight as 102 pounds.  (Id.)  A week later, on July 22, 1982, Dr. Greene examined Urbia and the record includes the following text: "Follow up. Laryngitis—hard time

swallowing—can't eat. Thyroiditis . . . Anxiety." (Id.) Urbia's weight was listed as 100 pounds. (Id.)

Dr. Greene prescribed Ativan (Id.), a medication used to treat anxiety. By July 26, 1982, Urbia's

ability to swallow and laryngitis improved and the Ativan mediation was continued. (R. at 322.) But on

October 5, 1982, Urbia reported no appetite and Dr. Greene reported, "Persistent laryngitis . . .

[weight] loss." (Id.) According to the record, Urbia weighed 96 pounds. (Id.) Dr. Greene prescribed

Triavil (Id.), a medication used to treat depression and anxiety. A follow-up on October 19, 1982

revealed that Urbia's "[d]epression improved" and that her weight had increased to 102 pounds. (Id.)

Dr. Greene modified the depression medication prescription to wean Urbia off the medication. (Id.)

By November 16, 1982, Urbia's depression had improved further. (Id.) On December 14, 1982, Dr.

Greene diagnosed Urbia with sinusitis and again prescribed Ornade. (R. at 321.) Urbia weighed 102

pounds. (Id.) The notes of Urbia's January 19, 1983 visit to Dr. Greene indicate "Ornade—(really

helping)." (Id.) Urbia weighed 104 pounds. (Id.)

On February 17, 1983, Dr. Swenson included the following notation in Urbia's medical

records: "Records to Mesaba Clinic, Chisholm." (R. at 300). Following this notation, the record is

devoid of any objective medical findings until December 19, 1985, almost a year after Urbia's last date

insured.

### b.        After Date Last Insured (December 31, 1984) Through Present

The next available record is of an examination of Urbia on December 19, 1985 by Dr. Greene.

(R. at 321.) The record indicates: "Cold. cough. hoarse voice. unable to sleep." (Id.) Urbia weighed

111 pounds. (Id.) Dr. Greene diagnosed her as having a respiratory infection and prescribed penicillin,

Ornade, and Bicillin, among other medications. (Id.)

9

Dr. Green also saw Urbia in November and December of 1986, observed Urbia had a red pharynx, diagnosed an upper respiratory infection, and prescribed Penicillin and Tavist D.  (R. at 320.)

In April 1987, he prescribed penicillin, Tavist D, and Fiorinal #3 for sinusitis and a muscle contraction headache—the first reference to a headache that appears in Urbia's medical records.  (R. at 320.)  In visits in May, June, July, October, and November of 1987, Dr. Greene noted that Urbia complained of sinusitis, headaches, earaches, bilateral ear pain, ringing, sore throat and worsening sore throat, night sweats, hoarse voice, coughing, smells and noise irritation and he diagnosed her with upper respiratory infection, pharyngitis, and sinusitis.  (R. at 318-19.)  He prescribed a variety of antibiotics to treat these ailments.  (Id.)

In January 1988, the medical record indicates Urbia reported having headaches and being nauseous from smelling foods.  (R. at 318.)  Dr. Greene noted Urbia's pharynx was red and that Urbia was depressed; he added Norpramine, an anti-depressant, to her medications.  (Id.)  On February 2, 1988, Urbia had an improved mood, but she was seen again on February 26, 1988 and reported being dizzy, spacey, with cough starting, headaches, and fever.  (R. at 317.)  She was given Tavist D.  (Id.) She received a prescription for Florinal #3 from Dr. Heck in June of 1988.  (Id.)  Dr. Greene again examined her in July, September, November, and December of 1988 during which time Urbia reported a sore throat, hoarse voice, headaches, stiffness, and complications from an intravenous line related to surgery (cellulits, sore hands, red streak in arm, and superficial phlebitis).  (R. at 316-17).  Again, antibiotics and Tavist D were prescribed for her upper respiratory ailments.  (Id.)  A FANA test was also administered in July 1988 which showed Urbia had antibodies present in a homogenous pattern with a titer of 1:160.  (R. at 349.)  Epstein-Barr virus tests showed Urbia had been infected with the

Epstein-Barr virus at an undetermined time.  (R. at 352.)  In September of 1988, at age 38, Urbia had

surgery for perianal Crohn's disease.  (See R. at 182.)  Dr. Greene examined Urbia twice in December

of 1988.  (R. at 314-15.)  Her upper respiratory infection had improved by December 5, 1988, but

Urbia still had a hoarse voice and night sweats; the records shows that by December 22, 1988,

however, Urbia had sinusitis headaches that were aggravated by sounds and neck and upper back

pain.  (R. at 314-15.)

Dr. Greene refilled Urbia's Fiorinal #3 in January of 1989 and prescribed Tylenol #3 in early

August of that same year.  (R. at 314.)  Her weight in January was recorded as 108 pounds.  (Id.)  On

August 21, 1999, Urbia reported diarrhea, chills, cramping, "knife stabbing," and anal irritation.  (R. at

313-14.)  Dr. Greene observed tenderness in her abdomen, particularly in the left lower quadrant.  (R.

at 313.)  Dr. Greene also noted that Urbia had a slightly elevated white blood cell count (9,000) and

complications relating to fistulectomy surgery.  (Id.)  Urbia weighed ninety-nine pounds.  (Id.)  On

September 6, 1989, Urbia reported diarrhea and cramping.  (Id.)  She weighed ninety-eight pounds.

(Id.)  Dr. Green observed her abdomen was somewhat tender.  (Id.)  On October 10, 1989, Urbia

reported having chills, headaches, zapped feeling, and fevers.  (R. at 312-13.)  Dr. Greene noted

Urbia's abdomen was soft, her white blood cell count was elevated (9,100) with 65% polys and her

temperature was elevated.  (R. at 312.)  He diagnosed her with a respiratory infection and chronic

Crohn's disease.  (Id.)  Urbia weighed 102 pounds.  (Id.)  On October 24, 1989, Urbia again saw Dr.

Greene this time reporting, "knife jabs" in her stomach; Dr. Greene found she had a mild respiratory

infection and a tender abdomen of unknown etiology.  (Id.)  In December of 1989, Urbia again

reported to Dr. Greene with upper respiratory disorders and again Dr. Green prescribed penicillin and

Hismanal.  (R. at 311.)

In January, February, March, April, May, and June of 1990 Dr. Green examined Urbia for a variety of ailments and diagnosed her as having a persistent upper respiratory infection, bilateral adnexal masses, sinusitis, headaches, muscle strain of the cervical spine (stiff neck with spasms and tenderness). (R. at 308-10.)  On March 2, 1990, her white blood count was considered slightly elevated when recorded at 8,100; on March 5, 1990 her white blood count was 9,367.  (R. at 310-11.)  About this time it appears that Urbia had surgery to remove ovarian cysts.  (R. at 310.)  On June 25, 1990, Urbia presented to the emergency room and claimed she had an allergic reaction to tung oil varnish.  (R. at 378.)  Urbia reported being cold, clammy, short of breath, hyperventilating, dizzy, having tingling and palpitations.  (Id.)  She was diagnosed by the attending with hyperventilation syndrome and given Ativan, an anti-anxiety medication.  (Id.)  On July 2, 1990, Dr. Greene diagnosed Urbia with bronchitis with question of bronchospasm, and on July 10, 1990, he diagnosed her with diarrhea related to Crohn's disease.  (R. at 306.)  On July 13, 1990, Dr. Heck diagnosed her with rhinitis and a cough secondary to postnasal drainage; on July 31, 1990 he diagnosed her with chronic fatigue, an upper respiratory infection, and possible mixed connective tissue disorder.  (R. at 305.)

On July 5, 1990, Urbia was examined by Dr. Alan Kind, an internal medicine infectious disease specialist, on a referral from a Dr. Goldberg.  (R. at 434-35.)  Dr. Kind described Urbia's history as follows:

> [O]n August 14, 1979, she acquired an illness that was flu-like.  Her ears rang.  She lost her voice for 4 months.  Her throat was sore.  She had a little fever. . . .  Since then, she has had the usual cast of symptoms which includes headache, tiredness, a sensation of feeling cold and clammy, dyspeneic, sore throat, cough, smells bother her.  Has significant achiness enough that she can't allow her husband to put his arms around her.  She thinks

she is now functioning about 20% of normal. . . . She says she is "allergic" to alcohol and that if she drinks any, she will get marked exacerbation of her symptoms. . . . She does have chronic sore throats. . . . She has all kinds of achiness.  She has had tests for lupus, for Lyme disease, rheumatoid arthritis, all of them have been unhelpful.  She can't lift things, just isn't as strong as she used to be.  She has some difficulty with concentration, intermittently sleeps poorly.  She does have some occasional tingling.

(R. at 434-35.)  Dr. Kind ordered a battery of tests and noted:

In summary, this young woman who was very active, became ill with a flu-like illness and has never been the same since.  It has caused its usual depression and anxiety, headaches, difficulty concentrating, etc. and she has had lots of work up which has been negative.  I think she fits the chronic fatigue syndrome fairly well.

(R. at 434 (emphasis added.))  A FANA test ordered by Dr. Kind was positive at a 1:640 titer.  (R. at 440.)  On July 12, 1990, Dr. Kind noted, "I did discuss this result with one of our rheumatologists and he thought that it is of possible significance."  (R. at 196.)  He also noted that Urbia's rheumatoid arthritis screening test was negative, her thyroid function was normal, her hemoglobin, white count, sed rate, differential count, urinalyis, and multiple chemistries were all normal except for an elevated cholesterol level.  (Id.)  Her liver and kidney functions, blood sugar and proteins were all normal and her Lyme titer was negative.  (Id.)  Dr. Kind noted on August 15, 1990: "We discussed the concept of environmental illness which I don't understand at all. . . . I don't see anything we can or should do and don't know how much of this is chronic fatigue/fibromyalgia or some sort of other illness yet undefined."  (R. at 433.)

Following her visit with Dr. Kind, Urbia regularly sought treatment from Dr. Heck and other physicians for many of the same ailments she had in the past and received diagnoses of upper respiratory infections, headaches, and sore throats, tension headaches, gastroenteritis, Crohn's disease, and swollen lymph nodes, among others.  (R. at 301-04.)

13

On June 4, 1992, Urbia first saw Dr. William Wilson.  (R. at 300.)  Dr. Wilson diagnosed Urbia with chronic fatigue syndrome (CFS) with secondary depression and a history of possible rectal Crohn's disease.  (Id.)  In July of 1992, Dr. Wilson began to administer vitamin B12 shots which appeared to increase Urbia's energy levels but did not affect her other symptoms.  (R. at 299.)  Urbia continued seeing Dr. Wilson and again reported many of the same symptoms such as those consistent with an upper respiratory infection.

From November 17, 1993 to December 8, 1993, Urbia was hospitalized with flu-like illnesses such as nausea, vomiting and diarrhea.  (R. at 197-209.)  Urbia weighed 96-97 pounds on November 26, 1993.  (R. at 216.)  She was given intravenous fluids to provide her with nutrition and hydration.  (R. at 200).  Diagnoses were questionable gastroenteritis, probable Crohn's disease, and chronic fatigue syndrome. (R. at 197-209.)  Her discharge diagnosis, signed by Dr. Robert D. Mackie, listed the following conditions:

1. Crohn's colitis.
2. History of perirectal Crohn's with fistula in the past.
3. Chronic fatigue syndrome dating to 1979.
4. Multiple environmental allergies.
5. History of tonsillectomy and adenoidectomy.
6. History of left inguinal hernia repair.
7. History of irregular menstrual bleeding.

(R. at 210.)  On December 14, 1993, Dr. Wilson described her as "thin, chronically-ill appearing."  (R. at 292).

On September 1, 1994, Urbia reported having quite severe daily headaches.  (Id.)  On September 6, 1994, Dr. Wilson diagnosed her as having herpes zoster (shingles).  (R. at 291.).  In December of 1994, Urbia was still reporting regular headaches with one to two fairly severe headaches

14

per month and continued to have problems with fatigue.  (Id.)

In February of 1995, she had a flare up of her Crohn's disease and continued to report fatigue and stress.  (R. at 398.)  In March of 1995, Dr. Wilson noted that Urbia continued to get fairly frequent muscular tension headaches that responded to Tylenol and/or Fiorinal #3 and which were sometimes precipitated by environmental factors or stress.  (R. at 290).  Urbia was again hospitalized in March of 1995 with a flare up of Crohn's colitis and again required hydration and a series of medications such as Prednisone, Percocet, and Imodium.  (R. at 232.)  Her discharge summary, authored by Dr. Robert Mackie, enumerated her discharge diagnosis:

1. Crohn's disease.
2. Chronic fatigue.
3. Multiple environmental allergies.

(Id.)  Her admission medical history indicates, among other things, "Chronic fatigue syndrome, dating to 1979."  (R. at 233.)  In July of 1995, Dr. Wilson again prescribed Fiorinal #3 for severe headaches.  (R. at 290.)  He noted that Urbia's chronic fatigue syndrome was "about the same" and stated, "Her symptoms will wax and wane."  (Id.)   In August of 1995, her colitis again flared up and she was again prescribed Prednisone.  (R. at 289.)  By September of 1995, Urbia was taking 30 milligrams (mg) of Prednisone per day.  (R. at 289.)  In November of 1995, she reported fairly severe headaches and presented with tender neck muscles.  (Id.)

In January of 1996, she was again experiencing problems related to her Crohn's disease.  (R. at 288.)  In March of 1996, Dr. Wilson recorded that Urbia was having fairly severe headaches lasting four or five days in a row.  (R. at 287.)  In September of 1996, Dr. Wilson also diagnosed her with stress-related anxiety."  (R. at 286.)  In October of 1996,  Dr. Wilson noted: "She is still very limited in

what she can do physically and has to frequently rest." (R. at 285.)

In November of 1996, Dr. Wilson recorded, "She has extreme weakness and is having some difficulty functioning." (R. at 284.) Her Prednisone prescription was increased up to "60 mg daily until her symptoms are controlled." (Id.)

In February of 1997, Urbia was admitted to the hospital for chest pain of non-cardiac origin. (R. at 239.) Dr. Charles Hecker assessed her condition: "This patient is under treatment for chronic fatigue syndrome of 15 years duration and Crohn's disease of approximately five years duration. She is presently doing quite well, although quite fatigued and sedentary." (R. at 239.) Her medical records indicate that her symptoms persisted for the remainder of 1997 with multiple medical evaluations. (R. at 270-82.) During this time Urbia tried unsuccessfully to wean herself off of Prednisone through a multitude of alternative and conventional treatments. (Id.)

In April of 1998, Urbia was again hospitalized, this time with deep venous thrombosis of the left thigh. (R. at 249.) Dr. Elizabeth K. Marchuk listed her Crohn's disease and chemical sensitivities as stable. (Id.) Thereafter, her condition improved somewhat until November of 1998 when her colitis and headaches acted up, and she was again prescribed increased doses of Prednisone. (R. at 248, 423-27.) On November 27, 1998, Urbia was again admitted to the hospital when her Crohn's disease flared up. (R. at 379.) She had severe bloody diarrhea and migraines. (R. at 380.) She was discharged on December 5, 1998 and prescribed Prednisone and mercaptopurine. (R. at 381.) On December 7, 1998, Urbia reported having difficulty sleeping and felt tired and weak. (R. at 422.) On December 17, 1998, a nurse who talked with Urbia over the phone noted that Urbia spoke very slowly and stated it was, "the worst day

she has had in years." (R. 386.)  Dr. Wilson noted on that day, "her fibromyalgia seems to be getting

much worse with diffuse aching and weakness." (R. at 421.)  By December 22, 1998, Dr. Wilson

noted that Urbia had been extremely tired since her Prednisone was suddenly decreased and that Urbia

reported being barely able to get out of bed." (R. at 420.)

> Dr. Wilson wrote on September 13, 1999, that:
>
> I have been treating Sharon Urbia … for years. She initially became ill in approximately
> 1979 with typical symptoms consistent with chronic fatigue immune deficiency syndrome.
> Her symptoms include extreme weakness, frequent sore throats, and intermittent fevers.
> She was exhausted to the point where she was no longer able to work.  At the time,
> chronic fatigue syndrome was not fully defined, but over the next decade the diagnosis
> became clear.  As a complication of her chronic fatigue syndrome, she has developed
> several other medical problems including multiple chemical sensitivities, deep vein
> thrombophlebitis, Crohn's disease, and fibromyalgia. She has also developed secondary
> mental problems including confusion and short term memory problems with declining
> cognitive function.  Immune deficiency typically associated with chronic fatigue syndrome
> often serves as a trigger for her other secondary medical problems.  In my opinion, she
> became totally disabled from her chronic fatigue syndrome in approximately 1979.  Her
> subsequent medical problems are all directly related to her immune deficiency.  The
> combination of these problems has rendered her completely unable to work since 1979.
> . . . I anticipate that she will continue to be totally disabled due to these medical problems
> for the foreseeable future.

(R. at 429 (emphasis added.))

## 2.      September 1999 Administrative Hearing

On September 16, 1999, Urbia appeared personally and testified before ALJ Cordek.  (R. at

40.)  At the hearing, which lasted about one and a half hours, Plaintiff was represented by Kathleen

McQuillan, a non-attorney disability representative.  (Id.)  Urbia's husband, stepson, and friend testified

at the hearing and eight letters were filed in support of Urbia's disability claim.  (Id.)[2]  William Villa, a

_____

[2] The Commissioner does not contest Urbia's summaries of the lay testimony, and the synopsis
of the testimony by this Court, set forth below, borrows heavily from Plaintiff's brief (See Doc. No. 19

vocational rehabilitation specialist testified as a neutral vocational expert.  (Id.)  No medical expert testified.

### a.      Sharon Urbia's Testimony

In August of 1979, Urbia was working as a children's librarian.  (R. at 102.)  Urbia testified that she had not worked since October 31, 1979, because "[o]n August 14, 1979, I came down with the flu with headaches, and sore throat, and loss of voice. . . . And it just never went away."  (R. at 617-18.)  She continued to work in August, September, and October, but rested during normal work breaks.  (R. at 636.)  She testified that other employees took over some of her duties such as putting books away because "they could see I wasn't feeling well."  (Id.)  The employer was not happy with her voice loss and let her know she had to find a cause for it because otherwise she would not be able to continue working.  (R. at 636.)  She testified, "I quit. I couldn't do it.  I wasn't doing justice to the—for the children."  (R. at 637.)

The ALJ asked her to describe her activities between the time she stopped work in October of 1979 and her date last insured in December of 1984.  (R. at 618, 621.)  She said that her mother did the housekeeping.  (R. at 621.)  "I did as much as I could on a very limited basis."  (Id.)  Her mother did the vacuuming and scrubbing.  Urbia testified:

> I would try to prepare a meal.  I would get out of bed and try to get out ingredients, and I would go back into bed. . . . And then I'd come out and I'd try to put it together, and then I'd go back to bed.

(R. at 622).  She did the dishes occasionally.  (Id.)  She could not change the sheets on her waterbed.

---

at 3-7) and adopts the sections incorporated herein as accurate reflections of the allegations made by the lay witnesses.  The Court discusses the weight that should be accorded these statements in Part V.C.4 of this Report and Recommendation.

18

(<u>Id.</u>)  Her husband did the laundry.  (<u>Id.</u>)  On a good day she would try to do the vacuuming "and

suffered" because she "overdid."  (R. at 622-23.)  When she overdid she "would have tremendous

headaches . . . . for maybe a week for doing one thing."  (R. at 623.)  She had someone come and

clean for her:

> And they can only come when it's a good day for me because the noise, or if it's too
> much, they can't come over.  And if they have fragrance, they can't come over.  And if I'm
> totally bedridden, I don't want them around because it's too much.

(R. at 623).

She used to love to walk; she would walk back and forth to work.  (R. at 623.)  But after she

stopped working the only hobby she could name was to "try to read."  (R. at 624-25.)  "I attempt to

teach religion, and it's under the basis that the other teacher, when it's a bad day, takes my class," she

stated.  (R. at 628.)  Each class session was forty minutes long, and she testified: "the[y] make

accommodations for me, believe me."  (R. at 629.)  She attended a chronic fatigue support group "via

phone because of the fragrance problem" and stated: "where the meetings are held, they have new

carpeting and I could not go in."  (R. at 629.)

Urbia testified that she had not been treated for Crohn's disease prior to December of 1984.

(R. at 630.)  She described her doctor visits in 1979: "I would go in with the loss of voice and the

fevers and the body aches, I was always given antibiotics."  (R. at 631-32.)  She had the following

exchange with her disability representative:

> Rep:   So thinking back to that time period between 1979 and 1984, Sharon,
> what—what was disabling you most at that time?  Why could you not return to
> work?
>
> Urbia:   Headaches, and I never had headaches prior to this.  I never—

Rep:     How often would you have headaches?

Urbia:   Every day.

Rep:     And how long would they last?

Urbia:   All day.

(R. at 632.)  The ALJ asked, "Excuse me Counsel.  Is there any medial evidence in the file for that time period that supports headaches [INAUDIBLE] before 1984?  Before the end of '84?"  (R. at 633.)  Urbia's representative then asked Urbia, "Did you consult with your doctors about your headaches, Sharon at that time?"  (Id.)  Urbia responded, "Yes, but they just sort of melted in there with the sore throat and they were just trying to figure out why I was not getting well from this."  (Id.)  Urbia also had the following exchange with her representative:

Rep:     Were there other symptoms that you were experiencing [between 1979 and 1984] that were interfering with your ability to return to work, Sharon?

Urbia:   Extreme exhaustion.  I couldn't even really get out of bed.

Rep:     So would you sleep at night?  How was your sleep at night?  Can you recall at that time how you were sleeping?

Urbia:   I would sleep, but I would have night sweats, fevers, chills, body aches.

Rep:     So you were—you were having difficulty with sleeping at that time?

Urbia:   Correct.

Rep:     And when you woke up, would you feel rested?

Urbia:   No.

(R. at 634-35.)

    She described a typical day before her date last insured.  She would wake when the children

woke, but not get up; the children and her husband would have breakfast, he would then check on her and get her some aspirin, she would go to the bathroom and go back to bed, call her mom to let her know she was okay, and take the phone off the hook.  (R. at 635.)  Usually she "just wanted to be in darkness, to rest before the family would come home."  (R. at 636.)  Her mother would help with errands or shopping or driving the children; her mother had a key to the house and would come to help. (Id.)  During the entire period from stopping work up to the end of 1984 she would spend most of the day in bed or on the couch.  (R. at 637.)

> Rep:    Was that a very typical state consistently during this entire four-five year period?
>
> Urbia:  Yes.
>
> Rep:    Have you had any time of improvement since then?
>
> Urbia:  No.

(Id.)

Urbia testified that she did try to "do something," based upon her doctors' recommendations. (Id.)  She wrote a little children's book and tried (unsuccessfully) to get it published.  (R. at 637-38.) She taught the religious education class twice a week during the school year, and signed up for community education classes with her husband (but he usually went by himself).  (R. at 638.)  During a "good week," she would teach two forty-minute religious education classes.  (R. at 629, 638.)  She would miss "at least half" of the classes due to her health.  (R. at 639.)  There was always a co-teacher there in case she had to leave.  (R. at 639.)

### b.    Frank Urbia's Testimony

Frank Urbia, Plaintiff's husband, testified that they were married in September of 1979.  (R. at

641.) She was working shortly after they got married, "and then she did get—she was having difficulty getting out of bed." (R. at 644.) The ALJ noted that in 1982 she was diagnosed with depression and was given medication for it. (Id.) Mr. Urbia stated "they probably brought that into the picture because they didn't seem to know what her problem was." (Id.) He indicated that, some time after 1982, she was trying to get help for the pain with some sort of pain management program. (R. at 645-46.) In November of 1979, she was not able to get up or get the kids off to school. (R. at 648.) He did the housework—dishes, clothes, even some cooking—and her mother would do most of the cleaning and some of the cooking for her "because [Urbia] just wasn't moving." (Id.) She could not drive all the time so the kids needed to get rides from him or a friend or Plaintiff's mother. (Id.) Plaintiff would try to attend their activities but had difficulty. When his son's team made it to the state tournament she wanted to go and they got the ticket for her "but she actually had to stay in the hotel because she wasn't strong enough to make it." (R. at 649.) Any improvement during her long period of illness "would be short. It's like any time she was feeling well, I think she wanted to do everything. And it just didn't seem to last, and then she'd be back to where she was." (Id.) The improvement would be "days to maybe up to a week, but no more than that." (Id.) Her condition had worsened over time "along with the Crohn's that she has." (R. at 650.) Her problems with chemical sensitivity started within the first year of their marriage—1979. (Id.) He testified that when exposed to chemicals to which she is sensitive, she gets headaches; her voice is affected. (Id.) She uses a charcoal filter mask. (Id.) He thought there was some dizziness with the headaches. (Id.) The symptoms were triggered by new carpeting, sometimes wood furniture. (Id.) "When we remodeled the house, she couldn't be in there for six months." (Id.) The symptoms even interfered with doctor's visits; she was

symptomatic before they opened the door to the doctor's office once when the office had new carpet and had been repainted.  (R. at 651.)

### c.     David Urbia's Testimony

David Urbia, Plaintiff's step-son, who is now the city administrator for a small town in south central Minnesota (R. at 656), testified that in 1984 he was sixteen or seventeen, in his junior year of high school (R. at 653).  He was asked to describe what health problems he had observed Urbia to have from about eighth grade through junior year, and testified:

> Well, sir, I remember that—not being able to attend a lot of the sporting events, or to go shopping around with us, or traveling.  And I just remember myself wondering, you know, what's this all about.  You know, it's just always being tired and needing to take naps of [INAUDIBLE] and having to be [INAUDIBLE] there's times when she had to sleep that, you know, not to disturb her so, you know, find work or play outside and just stay out of the way, you know.

(R. at 654.)  Before the illness she was "able to be active and go camping and do a lot of things and then that just changed." (Id.)  He would help with household tasks—mowing the lawn, taking care of the garden, cleaning.  (R. at 655.)  His father also helped.  (Id.)  The cooking was done by his dad and both grandmothers.  (R. at 655-56.)  He stated that since October of 1979, her condition had not improved.  (R. at 656.)

### d.     Laura Carlson's Testimony

Laura Carlson also testified.  She was the facilitator of Urbia's chronic fatigue support group (R. at 605), but had no contact with Urbia prior to 1984 (R. at 657).  Carlson stated that they talked on the phone, and she also saw Urbia a couple of times a year.  (R. at 658).  "She has a hard time even, you know, getting up or moving.  She had a hard time speaking and, you know, carrying on a

conversation." (R. at 659.)

    **e.**    **Eight Letters Submitted in Support of Urbia's Disability Claim**

The record contains eight letters submitted by Urbia in support of her disability claim. ALJ Cordek reviewed these letters as part of his decision. (R. at 44.) ALJ Kunz also considered these letters in making her decision. (R. at 29.) The contents of the letters are summarized below.

Terri Jugovich had known Urbia all of her life, and prior to her marriage would spend many days with her. (R. at 158.) She wrote that Urbia was very sick with mono at the time of her wedding in 1979. (Id.) "I remember that she was very weak and always confined to home (bed). After she was diagnosed with mono, we never did the same things as we did before." (Id.)

Barbara Ukura, who had been a close friend since high school, wrote that "[s]ince the fall of 1979 I have been aware of Sharon's extremely limited social schedule." (R. at 159.) Ukura stated that Urbia "no longer has the energy or inclination to be involved in community, church, or civic activities." (Id.)

Sister Cecilia Schmidt wrote that she had known Urbia for sixteen years [since 1982]. (R. at 160.) She saw Urbia fifteen to twenty times a year when she taught a religious education class to children at a convent. (Id.) Sister Schmidt described Urbia as an excellent teacher who was very responsible, missing class only when absolutely necessary. (Id.) But "[d]ue to her Chronic Fatigue illness she has had to miss class often." (Id.) Schmidt stated that, "Often [Urbia's] illness makes her suffer fatigue which makes teaching hard and sometimes just impossible." (Id.)

Carol Lahti, who had known Urbia as a teenager and became good friends with her in about 1988, wrote a long letter describing Urbia's problems. (R. at 161-63.) Lahti also has Chronic Fatigue

Syndrome but describes Urbia's condition as much more severe.  (R. at 161-62.)  She noted that Urbia had been a normal teenager, walked a lot and liked to have fun.  (R. at 161.)  Lahti's letter explains Urbia had been severely impaired since they came back into contact ten years previously, very physically limited, needing help, paying the price by recuperating for a few days when she tried to do something like shopping and not being able to socialize much although that was something Urbia loved to do.  (R. at 162.)  She stated that fatigue plays a major part in Urbia's life.  According to Lahti, Urbia has to lay down and rest after activity.  (Id.)  "She lives one day at a time, but it is very hard to plan ahead because you never know how you'll feel."  (Id.)

David Urbia, Urbia's step-son, who also testified at the hearing wrote that he had known his stepmother since early 1979, and lived at home with her until May of 1985, so he saw her daily.  (R. at 164.)  He said:

> I wondered, "why can't my mother do things that other mothers do?"  It was rare when she could muster enough strength to go shopping. . . . my mother could not attend my sporting events.   My mother could not work, complete yardwork, and even most housework, because she would become fatigued very easily.   I remember her needing rest, especially midday after lunch.  If I was home . . . I would find activities to complete outside of the home so as not to disturb her. . . . My father did the laundry . . . because the facilities w[]ere in the basement (stairs were a difficulty). . . . My grandmother also helped a lot . . . . with housework and prepared and delivered many evening meals for the family and lunches for my mother. . . .
>         . . . .
> Regarding activities that she can no longer [do] that we used to do, basically her health condition[] began [to] worsen shortly after I knew her, so I cannot make a comparison . . . . However, I know my mother held jobs and was extremely active prior to the worsening of her health.

(R. 164-65.)

Dick Wadnal, Urbia's  brother, wrote that prior to her illness she had been energetic,

enthusiastic, "with a flair for life." (R. at 166.)

> She was always coming up with new ways to gain employment. In her teens, she babysat and worked as a waitress. Even while attending school, she worked full time. Then approximately a year after she was married, (early fall of 1979) she was diagnosed with mononucleosis. Since then, her health has deteriorated, and there are many instances of times when she could not even function normally. . . . Her health has not allowed her a normal life since.

(Id.)

Deanne Hildenbrand wrote that she met Urbia in 1982 when she was a badge leader for the girl

scouts; the girls enjoyed her enthusiasm and ingenuity. (R. at 167.) They met again in 1987; she would

see Urbia twice a week because Urbia was a volunteer teacher at their church. (Id.)

> [T]here have been times that I've had to meet her at her car and walk her to the classroom, run errands for her, or even take over a class for her . . . .
>
> I have been with Sharon and seen a transformation come over her when someone has entered the room with cologne on. Her eyes turn red, her voice changes, and she has a hard time breathing.

(Id.)

Jeanne Jugovich, a teacher and colleague of her husband, described Urbia's problems

functioning, for things such as parent/teacher conferences:

> Sharon and I attempted to make contact for parent/teacher conferences . . . . It became seemingly more difficult to meet due to Sharon's health. She presented a significant weight loss, was continually tired (on occasions to the point of exhaustion) and meetings required rescheduling . . . . Our contact on many events was via phone . . . . . . . She appeared weak and her health status seemed to escalate in the first years of her marriage. (The school scuttle was that she was ill on their wedding day. I noticed how she proceeded on a downhill fatigue spiral during the early 1980[]s). Sharon was emaciated and haggard.
>   . . . .
>   This gal has had problems with fatigue to the point she did not continue with her work at the Chisholm Public Library way back in the beginning of her marriage. Weight loss, beyond normal sleeping, feeling "not good" (ill), isolation, inability to work, lack of

socializing and at times, the sharing of blues permeated Sharon's life since I've known her.

(R. 170-71.)

### f.    Vocational Expert's Testimony

Following the lay testimony, the ALJ and the vocational expert (VE) had the following

exchange:

ALJ:    Assume a person . . . . 29 to 35 years of age . . . . assume . . . a residual capacity lifting up to 50 pounds occasionally, 25 pounds more frequently, with the following limitations: based on a history of hoarseness, no work requiring frequent strong use of the voice; and based on evidence of some depression, concentration limiting the person somewhat to four to five-step operations.  With those limitations, and this is with a . . . twelfth grade education plus two years of post-secondary education including [INAUDIBLE} secretary of court reporter.  Would a Claimant with those limitations be capable of doing any of her prior work . . .?

VE:    She would not . . . and my rationale is although the exertional limitations posed by the hypothetical would be consistent with past work, the level of concentration on all past jobs were beyond—that's all skilled work, all beyond four to five-step level, Your Honor.

ALJ:    Would she be capable of any unskilled work with these limitations?

VE:    Yes. . . . There would be . . . hand packaging positions, for instance. . . . approximately 7,000 to 8,000 jobs. . . . There would be light, unskilled assembly types of positions . . . perhaps 4,000 to 5,000 such jobs. . . . There would be inspection positions. . . . perhaps 3,500 [jobs].
. . . .

ALJ:    Okay.  Now if, on the other hand, I assume during all relevant periods that the Claimant would be a person like the Claimant.  In addition to whatever other limitations I posited, would it have symptomotology documented by medical evidence which explains it that would preclude her from being a reliable employee of [INAUDIBLE] miss any work between three to ten work days per month. Would a person like that be able to do any—sustain competitive work?

VE:    Not [INAUDIBLE], Your Honor.

27

(R. at 660-64.)

### g.       ALJ Cordek's Findings and Decision

On December 28, 1999, ALJ Cordek issued his opinion in which he determined that the

evidence did establish that Urbia had not worked at any time relevant to the benefit determination and

was severely impaired by "voice hoarseness and 12.04 Affective Disorder of mild depression and mild

anxiety" but that such impairments did not meet or equal any listing in the Listing of Impairments in

Appendix 1, Subpart P, Social Security Regulation No. 4.  (R. at 52-53.)  The ALJ also found that

Urbia's subjective complaints were credible to the extent they alleged impairments that caused some

discomfort and limitation of function but that the testimony of her husband, stepson, and a friend were

not credible in light of "significant inconsistencies in the record as a whole."  (R. at 53.)  The ALJ found

that Urbia, prior to December 31, 1984, retained the ability to perform light exertional level work with

no frequent strong use of the voice and four-to-five step operations.  (Id.)  The ALJ found that, while

Urbia could not perform her past relevant work, she did retain the ability to perform a significant

number of jobs existing in the regional or national economy.  (Id.)  As a result of his findings, ALJ

Cordek determined that Urbia was not disabled as set forth in the applicable statutes from her claimed

onset date of October 31, 1979 through December 31, 1984, her date last insured. (R. at 40-41.)

Plaintiff then requested review of ALJ Cordek's decision by the Social Security Appeals Council

(Appeals Council).  (R. at 90-92.)

### 3.       Subsequent Medical Reports

Following Dr. Wilson's September 1999 comments, he continued to treat Urbia.  Her

conditioned waxed and waned somewhat but largely remained the same until March of 2000.  (See R.

at 487-91, 495, 560-61.)  On March 30, 2000, Dr. Wilson noted, "Her Crohn's disease

seems to be settling down."  (R. at 486.)  Urbia planned a graded exercise program and seemed less

depressed.  (Id.)  Urbia reported "a lot of diffuse back pain . . . numbness and tingling of both legs."

(R. at 485.)  An April 2000 MRI of Urbia's head showed no abnormalities; an MRI of her cervical

spine showed "extensive degenerative disc disease with multiple protruding discs but no nerve root

compression."  (Id.)  Urbia continued with regular treatments and examinations with Dr. Wilson and

reported similar symptoms, again with periods of mild improvement.  In December of 2001,  Dr.

Wilson noted that without Fiorinal #3 Urbia's pain was an 8 on a scale of 1-10 and that when she took

the medicine it was a 3 on a scale of 1-10.  (R. at 475.)  In 2002, Urbia's fibromyalgia worsened and

Urbia reported having aching muscles all over her body.  (R. at 471.)  Dr. Wilson reported, "She is

having a great deal of difficulty functioning."  (Id.)  Her Prednisone was again increased.  By September

of 2002, Urbia had developed bilateral cataracts, probably secondary to long-term prednisone

treatment.  (R. at  457.)

### 4.      May 2002 Appeals Council Remand Order

The Appeals Council granted review and on May 17, 2002, issued an order remanding the

case to another ALJ[3] for review.  (R. at 93.)  The Appeals Council remanded the decision of ALJ

Cordek to:

---

[3] The matter was remanded to a different ALJ because the Appeals Council found that ALJ
Cordek's comments that Urbia preferred to be a "stay at home" Mom instead of seeking "Ph.D.
employment" could create the appearance that ALJ Cordek was biased.  (R. at 95.)  Urbia never
stated such a preference and her formal education ended after two years of post-secondary training.
(R. at 605-660.)

1.  Further consider the medical opinion of Dr. Kind, dated July 5, 1990, who opined that Urbia's symptoms and history, "fit the chronic fatigue syndrome fairly well."  (R. at 94.)  The Appeals Council noted, "Although subsequent to the claimant's date last insured, Dr. Kind's opinion nevertheless requires further evaluation."  (Id.)

2.  When evaluating the credibility of Urbia's subjective complaints and the lay witness testimony consider Urbia's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; and other measures used to relieve symptoms.  (Id.)

3.  Give consideration to any new evidence, the treating, examining, and non-examining source opinions pursuant to the provisions of 20 C.F.R. § 404.1527, Social Security Rulings 96-2p, 96-5p, and 96-6p and explain the weight given to such opinion evidence.  (R. at 95.)

4.  Evaluate Urbia's subjective complaints in accordance with the disability regulations pertaining to evaluation of symptoms, 20 C.F.R. § 404.1529 and Social Security Ruling 97-7p.  (Id.)

5.  Obtain evidence from a medical expert, a rheumatologist and/or internist, to clarify the nature and severity of Urbia's impairments, prior to the date last insured in accord with 20 C.F.R. § 404.1527(f)) and Social Security Ruling 96p.  (Id.)

6.  Give further consideration to Urbia's maximum residual functional capacity, prior to December 31, 1984 and provide a basis for the determination with specific reference to evidence of record in support of the assessed limitations in accord with 20 C.F.R. § 404.1545 and Social Security Rulings 85-16 and 96-8p.  (Id.)

7.  Pose hypothetical questions to the vocational expert, if any, that reflect the specific

capacity/limitations established by the record as a whole.  (Id.)

### 5. Interrogatories

Urbia's case was remanded to ALJ Mary M. Kunz.  In September of 2002, ALJ Kunz solicited, via interrogatories, the opinion of Dr. Katherine Hiduchenko, a doctor with a primary speciality in internal medicine and a secondary specialty in endocrinology and metabolism.  (R. at 104, 443-449.)  She graduated from the University of Minnesota Medical School in 1954 and is licensed to practice medicine in Minnesota.  (R. at 104.)  Dr. Hiduchenko did not testify at either the first or second administrative hearing.  In answering the interrogatories, Dr. Hiduchenko stated she had "[t]reated several patients with CFS."  (R. at 445.)  The Social Security Administration has a contract with Dr. Hiduchenko to provide an independent medical review of the record for a fee when requested by the Commissioner.  (R. at 443.)  Dr. Hiduchenko did not testify at the second administrative hearing.

The fourth interrogatory posed by the ALJ asks:

> After your study of the medical exhibits of record, what medically determinable impairment(s), if any, were documented on or prior to December 31, 1984, the date the claimant was last insured for social security benefits?

(R. at 443.)  Dr. Hiduchenko's written response provides:

> No determinable severe impairment.  Patient had infectious mononucleosis diagnosed in January 1980.  Between 1979 and 1985 she had several respiratory infections, including diagnoses of laryngitis, pharyngitis, rhinitis, sinusitis, bronchitis, and "eustachitis", with frequent follow-up visits for same.
>
> She was suspected of having globus hystericus . . . and was very emotional when ENT exam was found to be normal . . . by an ENT specialist.  She also had an episode of hyperventilation symptoms which responded to sedation with phenobarbital.
>
> On 05/03/81 patient related generally not feeling well and having lost weight of 15 lbs over the past 1 ½ – 2 years. . . . Her serum calcium was low at 8.1 mg/dl . . . as it was on later occasions (outside of the time-period discussed), notably related to flare ups of her Crohn's Disease, causing malabsorption and/or malnutrition.

31

While diagnosis of Crohn's Disease was formally made in 1988, it is likely that her symptoms and signs in May 1981 could have been early manifestations of Crohn's Disease which is known to have remissions and exacerbations over the years. Her recorded weight figures were as follows: On 09/25/80 – 117 lbs, and in May 1982 102 lbs. No height recorded.[4]

The retrospectively mentioned diagnosis of Chronic Fatigue Syndrome (CFS) is not subject to consideration as the defining manifestation of CFS, i.e., "fatigue" was not even mentioned in the available medical records, pertaining to time period before Dec. 31, '94.

(R. at 444.) Dr. Hiduchenko also provided a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" in which she opined as to Urbia's functional capabilities based upon her review of Urbia's medical records from her alleged onset date through December 31, 1984 (her DLI). (R. at 444, 446-49.) Dr. Hiduchenko opined that prior to January 1, 1985, Urbia could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, could stand and/or walk about six hours in an eight-hour workday, could sit about six hours in an eight-hour workday, could climb occasionally, and could balance, kneel, crouch, crawl, or stoop frequently. (R. at 446-47.) Dr. Hiduchenko also indicated on the form that Urbia's impairments before January 1, 1985 required her to have limited exposure to dust, hazards such as machinery and heights, fumes, odors, chemicals, and gases. (R. at 449.) Dr. Hiduchenko did not answer the question on the form that asked her to "Describe how the environmental factors impair activities and identify hazards to be avoided." (Id.)

## II.    OCTOBER 2002 ADMINISTRATIVE HEARING AND ALJ KUNZ'S DECISION

The second administrative hearing took place on October 11, 2002 before ALJ Kunz and lasted nearly two hours. (R. at 668, 728.) Urbia and her husband appeared personally and testified in

---

[4] According to Urbia's 1994 and 1995 medical records, Urbia is five feet tall. (R. at 405-06.) Presumably, these records were available to Dr. Hiduchenko as part of her review. A September 27, 2002 medical record lists Urbia's height as sixty inches. (R. at 458.)

support of her claim.  (R. at 672-721.)  ALJ Kunz specifically stated in her determination that she also took into consideration the testimony provided at the first hearing, including the testimony of Urbia's stepson, friend, and the letters provided by claimant's relatives and friends which were treated as evidence at the first hearing.  (R. at 29.)  At the second hearing, Plaintiff was again represented by Kathleen McQuillan, a non-attorney disability representative.  (R. at 668.)  Edward Utities, a different vocational rehabilitation specialist, testified as a neutral vocational specialist.  (R. at 721.)  Dr. William Wilson, Urbia's treating physician since 1992, also testified at the hearing.  (Id.)

### A.    Hearing Testimony

#### 1.    Additional Testimony of Sharon and Frank Urbia

Urbia again attested to the work history described above.  She said she continued to work after August 14, 1979 but explained: "For breaks, lunches, I would go to the library board room and I would lay on the couch and I'd have somebody come and make sure that I was awake."  (R. at 702.) Urbia explained she finally resigned her position.  She explained why she quit her job as follows: "I could not speak, and the head librarian was putting a lot of stress on me because I had to give book talks and children programs . . . and you needed a voice and I could barely whisper.  And the headaches were really, really bad."  (R. at 703.)

After she stopped working, Urbia testified she was able to make sure her husband's two children, one a girl, at the time about age ten, and the other a boy, at the time about age twelve, got off to school.  (R. at 704.)  Then Urbia would go back to bed and stay there until the children came home from school.  (Id.)  Her stepdaughter was mentally disabled and Urbia testified that Urbia's mother would assist Urbia in caring for the child as needed.  (R. at 703-04.)  Urbia testified that she tried to

33

help the girl with her homework after school.  (R. at 705.)  Urbia stated that her mother and husband did most of the cooking but that she could make a sandwich or use the microwave.  (Id.)  Urbia stated that she did go to "a couple" of her son's sporting events and did go to parent-teacher conferences, mainly for the girl.  (R. at 706.)  She also tried to take some community classes but would "go once or twice" and then have to "drop out because [she] couldn't continue."  (R. at 707.)  One was a creative writing class; Urbia wrote a little children's book and tried to get it published.  (Id.)  She also helped Girl Scouts get a "book badge," by leading six one hour sessions at her house.  (R. at 708-09.)

Urbia reported that she did not do the laundry, did not socialize with her friends, and did not do the shopping for the household.  (R. at 709.)  She stated she had "good days and bad days" and could drive a car on good days.  (Id.)  On good days she testified that she would try to clean the house, make supper, attempt to go to a basketball game, and help her stepdaughter with her homework.  (R. at 711.)  She stated, however, that even her good days after August 1979 did not match her health prior to that time.  (Id.)  Urbia testified that on a good day she would overexert herself and her headaches "would be even more severe" than normal and all of her symptoms, such as tiredness, would appear. (Id.)  Urbia stated that on a good day she would communicate with her step-daughter with sign language because she could not speak.  (Id. at 711.)  She also explained that immediately following her resignation, she went to the doctor regularly and did not know why there should be any lapse of two years in her medical records.  (R. at 710.)

Urbia testified that on bad days she could not move except to get up and go to the bathroom and take a sponge bath.  (R. at 712.)  She testified that from her alleged date of onset through the end of 1984 she had more bad days than good days.  (R. at 713.)

Claimant's husband, Frank Urbia also testified again at the second administrative hearing.  He

testified that shortly after their marriage on September 1, 1979, his wife became ill.  (R. at 715.)  He

stated that she could not speak during their wedding ceremony and that one of the members of the

church choir "hung a big sign there that [Frank Urbia] was quite fortunate for having a wife that couldn't

talk."  (Id.)  He testified that before her illness, his wife was very active with the children's program at

the library and that her physical capabilities changed dramatically after the illness.  (R. at 716.)  He

testified that his wife was frustrated with the doctors, because, "it was obvious that she was ill, like, into

the '80s. [INAUDIBLE] there, so it started early but it was kind of like a progression.  And so some of

that soreness and that's the kind of stuff I remember really."  (R. at 717.)

### 2.    Dr. Wilson's Testimony and Functional Assessments

Almost forty percent of the pages of the transcript of the second administrative hearing are

devoted to the examination of Dr. Wilson, Urbia's treating physician since 1992.  (See R. at 677-699.)

Dr. Wilson testified that he is board-certified in family medicine and his areas of interest are in

preventative medicine, aggressive [INAUDIBLE] risk factors, and neurobiology.  (R. at 695.)  He

indicated that his interest in neurobiology—which he linked to a proper understanding of CFS—had led

him to talk personally with those considered experts on CFS.  (R. at 692.)  He also testified that he

regularly emails a Dr. Titlebaum, who is "considered one of the country's experts."  (Id.)  Dr. Wilson

noted, "I try to keep up with the literature.  We've actually done some in-house studies in our clinic

looking at certain aspects of [CFS]."  (R. at 685.)

Urbia's representative asked Wilson about the onset date of Urbia's CFS: "[D]o you believe

that her history that she's reported to you is credible in terms of the onset of this?  Have you seen

medical findings that would support the things she's saying about this long-term struggle[?]"  Wilson

responded:

> Yes, because . . . . patients can give you a pretty defined onset based on when their
> symptoms started.  And, of course, typically it varies from patient to patient, but it's a
> chronic problem.  And, I mean, it typically does not spontaneously disappear at least in a
> short period of time although some patients do have some degree of recovery over time
> that varies.

(R. at 680.)  After taking time during the hearing to review the pre-DLI medical records and Dr.

Hiduchenko's answers to the ALJ's interrogatories, Dr. Wilson was asked "whether the information in

the file provide[d] enough information or enough evidence to confirm . . . a diagnosis of chronic fatigue

[before December 31, 1984]."  (R. at 682.)  Dr. Wilson stated:

> Well, it's a little bit difficult . . . her history of being mono and then having a series
> of frequent upper respiratory type infections and complaints at the time were labeled as
> almost psychosomatic.  At the time that she initially had the mononucleosis, often patients
> with chronic fatigue syndrome/fibromyalgia, there's an acute infectious process that
> triggers—it's a response to an infection and it's not restricted to [INAUDIBLE] or
> mononucleosis. . . . So far as the comments [of Dr. Hiduchenko] about not mentioning
> about fatigue, et cetera, physicians often didn't even inquire about those symptoms in
> patients, and . . . the documentation at that time was not nearly as extensive as we do now
> in terms of covering [INAUDIBLE]. . . . I think you have to rely on a patient's history, and
> what we now know about these syndromes that we weren't asking the right questions, we
> often ignore—when chronic fatigue syndrome and fibromyalgia were first evolving as
> syndromes, they were—the medical profession were thought not to be real and
> disregarded, patients' complaints were ignored, and so its not unusual to see this in records
> from that time.

(R. at 682-83.)  He continued his answer:

> [S]he's one of the more severe cases I've seen, and in my experience, someone of this
> severity, it's not—it doesn't, you know—it's consistent with the records I see here if I
> read between the lines a little bit, and I think I have to be allowed to do that because of the
> nature of medical records kept at that time.  Most patients, you will see no—you know,
> you won't see references to a lot of the complaints that—you know, if you don't know
> which questions to ask the patient and you don't document them, you won't get those—it

won't get in the record.  We find that that's true even today, that patients that don't have
an interest in these problems, you'll see a patient with these syndromes and you won't see
anything in the records reflecting any of their complaints.  They'll be pushed aside as, well,
so what if you're tired.  I'm tired too.  So what if you're hurt, I hurt too.  I mean, it—you
know, it has to—the person evaluating the person has to have some understanding of these
syndromes and problems to even address them in the record and understand what's going
on with that patient.

(R. at 686-87.)  Dr. Wilson specifically noted that a depression diagnosis in a person with CFS "is

really not a correct diagnosis. [Persons with CFS] have symptoms that overlap the depression.  That's

the nature of the disease."  (R. at 688.)  He stated that, "I think, that at that time, people are coming in

and saying, I'm tired, and I don't feel good and I have no energy, and I don't—can't seem to do the

things that everyone else does.  At that time, [were] labeled as depressed. . . . when, in fact, that wasn't

the correct diagnosis."  (Id.)  Dr. Wilson explained that "[a]ll chronic fatigue syndrome and fibromyalgia

patients have abnormalities in those neurotransmitters which will universally result in some symptoms of

depression.  So depression, certain symptoms will get better" if the patient is given anti-depressants.

(R. at 689.)  He testified that "it would surprise me that if [INAUDIBLE] symptoms got temporarily

better, and especially if he didn't ask the right questions about the rest of the syndrome."  (Id.)  "I

mean," he stated, "we have . . . a checklist of their symptoms so we know we're not missing critical

symptoms."  (Id.)  "If you don't ask, they may not tell you."  (Id.)

In response to Dr. Hiduchenko's contrary opinion, Dr. Wilson stated:

[I]nternal medicine specialists have, in my experience, have had no training in neurobiology.
None.  Zero.  They wouldn't know serotonin from a sock.  And if you don't understand
brain chemistry, you will not understand what's wrong with [INAUDIBLE].  That's what
the core of the problem is.  That's what the literature says it is. . . . It's not an internal
medicine—I mean, it's not—there's no specialty that deals with these syndromes, unless
you have taken a special interest in neurobiology.

(R. at 692.)

The ALJ asked Dr. Wilson to offer an opinion on Urbia's "functional abilities" prior to her date last insured.  Dr. Wilson responded:

> Well typically at the onset of the syndrome, which I could correlate with when she was diagnosed with infectious mononucleosis, the symptoms are generally very severe right away.  I mean they don't come on gradually.  And the problem is that fatigue is something that is very hard to quantify, and it varies somewhat from—on a day to day basis, so on one day, a patient might be able to work and do certain things that they can't do on the next day, so—in the most structured job situations, it becomes very difficult because they're—they may frequently miss work entirely, and they just don't have the energy to go to work.  And when they do one day, they might be able to work two hours, the next day four, and so trying to put restrictions on these people is difficult because many—I would say the majority that have full-blown chronic fatigue/fibromyalgia cannot work at all during the first several years of their illness.

(R. at 696.)  Dr. Wilson testified that 90-95% of CFS patients, "very quickly after" their onset illness—like Urbia's mono—cannot "work at all."  (R. at 697.)

On October 10, 2002, Dr. Wilson also filled out a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form.  (R. at 450-52.)  He opined that Urbia could lift/carry fifteen pounds occasionally; ten pounds frequently; stand and/or walk two hours in an eight-hour workday (only a half an hour without interruption); sit four hours in an eight-hour workday (only one hour without interruption); never climb, balance, crouch, stoop, kneel, crawl; occasionally stoop; had limited ability to reach, handle, feel, push/pull, and speak; and had limitations due to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibrations.  (Id.)

Finally, also on October 10, 2002, Dr. Wilson completed a "(Mental) Functional Capacity Assessment Questionnaire" in which he opined that Urbia had a poor or no ability to deal with the public, deal with work stresses, or maintain attention/concentration due to "typical 'fibro fog' or mental

38

impairment secondary to chronic fatigue syndrome and fibromyalgia." (R. at 453.) He indicated that Urbia had a poor or no ability to understand, remember, and carry out complex job instructions or understand, remember and, carry out detailed but not complex instructions. (R. at 454.)

### 3.    Vocational Expert's Testimony

ALJ Kunz and the VE had the following exchange:

ALJ:    I want you to assume that we have an individual during the relevant time period that was 29 to approximately 34 during the relevant time period, so would be a younger individual throughout the relevant time period. Obviously the individual has a high school education and additional training as court reporter . . . secretary training, as well—with the work experience as described in your report. In the first hypothetical, I want you to assume that this individual was capable of light work as that is described in Social Security regulations, which would involve lifting up to 20 pounds occasionally, 10 pounds frequently; up to six hours of standing, six hours of sitting in an eight-hour workday. Should involve no more than occasional climbing, and should not be required to perform work that would involve exposure to . . . dust, fumes, odors, chemicals, gasses, or any work near hazardous machinery or work at heights. Given those limitations, can this individual perform any of the jobs that [INAUDIBLE] the past?

VE:    . . . . in my professional opinion, Judge, this hypothetical will allow for all the Claimant's past relevant work as a legal secretary, secretary, and children's librarian.

(R. at 725.) The ALJ indicated that she was "not going to ask [a] hypothetical question based on the medical assessment done by Dr. Wilson" because Dr. Wilson opined that Urbia "could only walk or stand two hours and sit for four hours. That's six hours" and "Social Security's policy is that if that's what's found to be the residual functional capacity" then the person would "not be capable of competitive work." (Id.) The ALJ found this assessment to be one "that the vocational expert's testimony can never overcome." (Id.) The ALJ posed no other hypothetical questions to the VE.

B.      **ALJ Kunz's Decision**

On February 25, 2003, ALJ Kunz issued her decision in which she found that Urbia had not engaged in substantial gainful activity after October 1, 1979.  (R. at 31.)  The ALJ also found that Urbia was severely impaired for the period through December 31, 1984 by a history of respiratory infections but that none of Urbia's ailments alone or in combination with each other met or equaled the criteria of any impairment set forth in the Social Security regulations.  (R. at 31-32.)

The ALJ did not give "any weight" to the opinions and statements of Dr. Wilson or Dr. Kind. (R. at 28-29.)  The ALJ instead gave the "greatest weight" to the opinion of Dr. Hiduchenko.  (R. at 29.)  She discounted the opinions of state agency reviewing physicians to the extent they found no severe impairment but adopted those same opinions to the extent "they support the conclusions set forth in this decision" concerning Urbia's impairments prior to January 1, 1985.  (R. at 30.)

The ALJ discounted the testimony of Urbia and the other witnesses testifying on behalf of Urbia as "not wholly credible due to significant inconsistencies in the record as a whole."  (R. at 32.)  The ALJ found their testimony supported some credible degree of fatigue.  (R. at 29.)  But she determined "further functional capacity reduction" based upon their testimony was not warranted because their testimony was provided in or after 1998 and not supported by the pre-DLI objective medical evidence. (R. at 29.)  Her decision sets forth the residual functional capacity of Urbia:

> for light work activities, as light work is described in the regulations, but with lifting limited to twenty pounds occasionally and frequent lifting of ten pounds, standing up to six hours, and sitting up to six hours of an eight-hour day, with no more than occasional climbing, that would not require performance of work involving exposure to dust, fumes, odors, chemicals, or gasses or any work near hazardous machinery or work at heights.

(R. at 32.)

Based on the above and the VE's response to her hypothetical question, the ALJ found that Urbia retained the ability, for the period through December 31, 1984, to perform her past relevant work as a legal secretary, secretary, and children's librarian.  (R. at 32.)  Thus, she concluded that Urbia was not disabled.  (Id.)

## III.   PARTIES' POSITIONS

Urbia contends that ALJ Kunz committed reversible error by (1) basing her determination of Urbia's pre-DLI residual functional capacity solely on medical records in existence before her last date insured and failing to infer Urbia's onset date from other evidence in violation of Social Security Ruling (SSR) 83-20; (2) not affording any weight to retrospective medical opinions that Urbia had disabling CFS as of Urbia's alleged onset date; and (3) discounting Urbia's testimony that she was unable to work as of her onset date because Urbia had "a problem with her former work supervisor which might have provided a non-medical reason for her stopping work" and because the ALJ found no evidence Urbia sought rehabilitation services during the relevant period.  (Pl.'s Mem. at 37-44.)

The Commissioner responds that the ALJ complied with SSR 83-20 and explicitly considered all the record evidence, even the medical evidence subsequent to Urbia's date last insured and the retrospective medical opinions.  (Def.'s Mem. at 7-9.)  The Commissioner argues that the medical records documenting events before December 31, 1984 do not justify a finding of CFS and no evidence exists that Urbia had any medical treatment from January 19, 1983 through December 19, 1985.  (Id. at 8-9.)  The retrospective opinions Urbia cites, according to the Commissioner, were considered by the ALJ in combination with lay testimony about Urbia's pre-DLI condition but were rejected properly because they were inconsistent with other retrospective medical opinions.  (Id. at 11-

41

12.)  Finally, the Commissioner contends that the ALJ rejected Urbia's subjective assessment of her condition based upon Urbia's ability to perform a variety of daily activities and the lack of medical records from January 19, 1983 through December 19, 1985.  (<u>Id.</u> at 13.)  According to the Commissioner, the ALJ did not discredit Urbia based upon any difficulties she might have had with her last employer but instead found her work history to be a neutral factor.  (<u>Id.</u> at 13-14.)

## IV.   STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A) (2000).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423 (d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 423 (d)(1)(A).

"In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."  <u>Pyland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c) and Eighth Circuit cases).  "Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, in helping to elucidate a medical condition during the time for which benefits might be rewarded."  <u>Id.</u> at 877.

**A.** **Administrative Review**

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482.  The decision of the Appeals Council (or of the ALJ if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days (or later time period set by the Appeals Council) after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**B.** **Judicial Review**

The Court's review is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  But "[t]he substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id. (quoting Smith v. Heckler, 735 F.2d 312, 315 (8th Cir. 1984)).  In reviewing the administrative decision, "'[t]he substantiality of evidence must take

into account whatever in the record fairly detracts from its weight.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Harwood v. Apfel, 186 F.3d 1039, 1042 (8th Cir. 1999). The possibility that the court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).

In general, the claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). "If the ALJ finds that the claimant cannot return to his past relevant work, the burden of proof shifts to the [Commissioner], who then has the duty to establish that the claimant is not disabled within the meaning of the Act." Talbott v. Bowen, 821 F.2d 511, 514-15 (8th Cir. 1987). The Commissioner must prove that the claimant retains the ability to do other kinds of work and other work the claimant can perform exists in substantial numbers in the national economy. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).

The reviewing court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The Court is required to review the administrative record and to consider:

1.    The credibility findings made by the ALJ.

2.    The Plaintiff's vocational factors.

3.      The medical evidence from treating and consulting
        physicians.

4.      The Plaintiff's subjective complaints relating to exceptional and non-
        exertional activities and impairments.

5.      Any corroboration by third parties of the Plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based
        upon a proper hypothetical question which sets forth the Plaintiff's
        impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d

523, 527 (8th Cir. 1980)).

        Pursuant to the Social Security Act, the Secretary of Health and Human Services promulgated

a five-step analysis to be followed by the ALJ in determining whether a claimant is disabled:

1.      Has the claimant engaged in substantial gainful activity since the
        alleged onset disability?

2.      Is the claimant suffering from a severe impairment?

3.      Does the claimant's impairment meet or equal the Listing of
        Impairments set forth by the Social Security Administration in
        the code of federal regulations.

4.      Does the claimant have the residual functional capacity (RFC) to
        perform the claimant's past relevant work?

5.      If the claimant is unable to perform past relevant work, is there
        any other work in the national economy that the claimant can
        perform?

20 C.F.R. § 416.920(b)-(f); Bowen v. Yuckert, 482 U.S. 137 (1987).

## V.    DISCUSSION

### A.    Chronic Fatigue Syndrome

In 1999, the Social Security Administration issued Ruling 99-2p which is entitled, "Policy Interpretation Ruling Titles II and XVI: Evaluating Cases Involving Chronic Fatigue Syndrome (CFS)." 64 Fed. Reg. 23380, 23380-84 (Apr. 30, 1999), available at, 1999 WL 271569, at *1-*8 and http://www.ssa.gov/OP_Home/rulings/di/01/SSR99-02-di-01.html (hereinafter SSR 92-2p).  The regulation, like all Social Security Rulings, is "binding on all components of the Social Security Administration."  See Heckler v. Edwards, 465 U.S. 870, 873 n. 3 (1984).  The ruling provides:

> CFS is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity.  The current case criteria for CFS, developed by an international group convened by the Centers for Disease Control and Prevention (CDC) as an identification tool and research definition, include a requirement for four or more of a specified list of symptoms.  These constitute a patient's complaints as reported to a provider of treatment.
>
> However, the Social Security Act (the Act) and our implementing regulations require that an individual establish disability based on the existence of a medically determinable impairment; i.e., one that can be shown by medical evidence, consisting of medical signs, symptoms and laboratory findings.  Disability may not be established on the basis of an individual s statement of symptoms alone.
>
> This Ruling explains that CFS, when accompanied by appropriate medical signs or laboratory findings, is a medically determinable impairment that can be the basis for a finding of "disability."  It also provides guidance for the evaluation of claims involving CFS.

Id. 64 Fed. Reg. at 23381, 1999 WL at * 1-*3.  The ruling continues:

> CFS is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity.  It is characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities.  In accordance with criteria established by the CDC, a physician should make a diagnosis of CFS "only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded"

46

(Annals of Internal Medicine, 121:953-9, 1994).[5]  CFS has been diagnosed in children, particularly adolescents, as well as in adults.

Under the CDC definition, the hallmark of CFS is the presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities. Additionally, the current CDC definition of CFS requires the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue:

———————————————

[5] The complete citation is Keiji Fukuda, et. al, The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study, 121 Annals of Intern. Med. 953, 953-59 (1994), available at http://www.annals.org/cgi/content/full/121/12/953.  The 1994 publication superceded the 1988 publication of another group of medical researchers convened by the CDC, in which chronic fatigue syndrome was first named and defined.   See Holmes GP, et al., Chronic Fatigue Syndrome: A Working Case Definition,108 Annals Intern. Med. 387, 387-89 (1988), cited in Fakuda, 121 Annals of Intern. Med. at 953-59.  According to the authors of the 1994 CDC definition, there are only a few conditions that would exclude a patient from a diagnosis of unexplained chronic fatigue:

1. Any active medical condition that may explain the presence of chronic fatigue [31], such as untreated hypothyroidism, sleep apnea, and narcolepsy, and iatrogenic conditions such as side effects of medication.

2. Any previously diagnosed medical condition whose resolution has not been documented beyond reasonable clinical doubt and whose continued activity may explain the chronic fatiguing illness. Such conditions may include previously treated malignancies and unresolved cases of hepatitis B or C virus infection.

3. Any past or current diagnosis of a major depressive disorder with psychotic or melancholic features; bipolar affective disorders; schizophrenia of any subtype; delusional disorders of any subtype; dementias of any subtype; anorexia nervosa; or bulimia nervosa.

4. Alcohol or other substance abuse within 2 years before the onset of the chronic fatigue and at any time afterward.

5. Severe obesity as defined by a body mass index (body mass index = weight in kilograms/(height in meters)$^2$) equal to or greater than 45.

Fukuda, et. al, 121 Annals of Intern. Med. at 953-59, cited in SSR 99-2p,

- Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;
- Sore throat;
- Tender cervical or axillary lymph nodes;
- Muscle pain;
- Multi-joint pain without joint swelling or redness;
- Headaches of a new type, pattern, or severity;
- Unrefreshing sleep; and
- Postexertional malaise lasting more than 24 hours.

Within these parameters, an individual with CFS can also exhibit a wide range of other manifestations, such as muscle weakness, swollen underarm (axillary) glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity), orthostatic intolerance (e.g., lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficulty comprehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irritability, anxiety).

Id.

The Social Security Administration has adopted the definition of CFS set forth by the CDC but requires that, in addition to a claimant's self-reported symptoms, "there must also be medical signs or laboratory findings before the existence of a medically determinable impairment may be established." Id. The Social Security Administration (SSA) acknowledges that "no specific etiology or pathology has yet been established for CFS." Id. The SSA has released a non-exclusive list of examples of medical signs that establish the existence of a medically determinable impairment in persons with CFS. Id. 64 Fed. Reg. at 23382, 1999 WL at *3. The list includes: palpably swollen or tender lymph nodes on physical examination, nonexudative pharyngitis; persistent reproducible muscle tenderness on repeated examinations; including the presence of positive tender points; an elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640; abnormal magnetic resonance imaging (MRI) brain scan; neurally mediated hypotension as

48

shown by tilt table testing or another clinically accepted form of testing; signs of anxiety or depression; or <u>any other medical signs or laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.</u>  <u>Id.</u> (emphasis added).

According to the CDC, other commonly observed symptoms of CFS (occurring in 20-50% of CFS patients) include: abdominal pain, alcohol intolerance, bloating, chest pain, chronic cough, diarrhea, dizziness, dry eyes or mouth, earaches, irregular heartbeat, jaw pain, morning stiffness, nausea, night sweats, psychological problems (depression, irritability, anxiety, panic attacks), shortness of breath, skin sensations, tingling sensations, and weight loss.  Center for Disease Control and Prevention, <u>Chronic Fatigue Syndrome</u>, <u>What is CFS?</u>, http://www.cdc.gov/ncidod/diseases/cfs/about/ what.htm (last visited August 1, 2005).

### B.      <u>Onset of Disabilities of Nontraumatic Origin and Urbia's Pre-DLI Medical Records</u>

In 1983, the SSA issued Ruling 83-20, entitled, "Titles II and XVI: Onset of Disability."  SSR 83-20, <u>available at</u> 1983 WL 31249, at *1-*8 and http://www.ssa.gov/OP_Home/ rulings/di/01/SSR83-20-di-01.html (last visited Aug. 2, 2005) (hereinafter SSR 83-20).  The purpose of the ruling is "[t]o state the policy and describe the relevant evidence to be considered when establishing the onset of disability under the provisions of [T]itles II and XVI of the Social Security Act . . . and implementing regulations."  <u>Id.</u>, 1983 WL at *1.

The ruling provides: "In disabilities of nontraumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity.  <u>The weight to be given any of the relevant evidence depends on the</u>

49

<u>individual case.</u>" <u>Id.</u>, 1983 WL at *2 (emphasis added).  The ruling recognizes that in evaluating

medical evidence,

> [d]etermining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, <u>it will be necessary to infer the onset date</u> from the medical and other evidence that describe the history and symptomatology of the disease process.

> Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset date can be established.  In such cases, consideration of vocational factors can contribute to the determination of when the disability began.

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.

> . . . .  In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant evidence is not available, it may be necessary to explore other sources of documentation . . . . from family members, friends, and former employers to . . . furnish additional evidence regarding the course of the individual's conditions. . . . <u>The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record.</u>

> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition).  The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in [substantial gainful activity] or gainful activity for a continuous period of at least 12 months or result in death. . . . Convincing rationale must be given for the date selected.

<u>Id.</u>, 1983 WL at *2-*3 (emphasis added).

The record reflects that Urbia visited a doctor two times immediately preceding and twenty-

eight times after her alleged onset date through and including January 19, 1983.  (See R. at 300, 321-27.)  Her twenty-eight visits in about thirty-seven months are recorded on just eight letter-size pages, are often cryptic, and lack detailed descriptions of Urbia's subjective complaints.  (Id.)  No records of medical visits from January 19, 1983 through December 19, 1985 have been entered into evidence.  Urbia explains that the gap in records exists because she changed clinics and her clinic changed management but contends she continued to receive treatment during the gap period.  (Pl.'s Mem. at 43.)  Urbia's contention has support in the February 17, 1983 notation of Dr. Swenson which indicates in Urbia's chart, "Records to Mesaba Clinic, Chisholm."  (R. at 300.)  As an initial matter, the Court finds Urbia's explanation is probable.  Further, given the significant number of doctor's visits made by Urbia prior to and after the gap period, the Court does not find the ALJ's conclusion that these records suggest Urbia's condition improved (R. at 28) to be supported by substantial evidence in the record as a whole.  Finally, Dr. Wilson testified that such a gap in the medical records of a person with CFS would not be unusual considering that, for the most part, the treatments she received prior to the time gap failed to alleviate her symptoms except for short periods of time.  (R. at 698.)  Wilson testified that a two-year gap in the medical records of a person with CFS in the 1980s would be consistent with frustration due to the lack of treatment success (Id.) and that he "wouldn't read [the gap in the medial records] as being a spontaneous remission."  (R. at 699.)

The Court agrees with the ALJ that, looking only at the records in existence before Urbia's date last insured, no direct complaint or documentation of fatigue is evident.  The Court, however, also finds that the records document very few subjective comments and are, in many places, cryptic and

undeveloped at best.[6]  First, many of the medical records that antedate her date last insured contain no documentation of Urbia's subjective complaints <u>at all</u>.  For example, her September 12, 1980, November 3, 1980, January 19, 1981, May 21, 1981, and January 19, 1983 doctor visits contain no documentation of Urbia's subjective complaints.  (<u>See</u> R. at 300, 321, 324, 326.)

Second, follow-up appointments often only indicate her subjective complaints by reference to her prior diagnosis.  For instance, on December 14, 1982 her subjective complaint was listed as "Follow up Depression" (R. at 321), on July 26, 1982 only "Follow up" was written (R. at 322), on October 5, 1982 "Follow up Laryngitis—improved" and "no appetite" was reported (R. at 322), and on November 16, 1982 the complaint was "Follow up Depression" (R. at 322).

Third, where handwritten, the notes of Urbia's subjective complaints often occur in handwriting that is different in appearance from that of the prescribing doctor, suggesting a nurse or some other intake person and not the doctor, recorded Urbia's complaints.  (<u>See e.g.</u>, R. at 320-23.)  As a result, it may be that none of Urbia's subjective complaints she made directly to the doctors were recorded.

Fourth, even where Urbia apparently had involved discussions with her doctors, only ambiguous notes were recorded.  The complete entry for one examination in 1981 is as follows: "Continuation of pyoderma.  Rx for Tetracyclene, 1 b.i.d.  Actifed 1 tab. prn. for respiratory congestion.  Considerable discussion of multiple tension related factors."  (R. at 324.)  There is no information provided about what precipitated the discussion or what was discussed.  The dearth of

_____

[6] Dr. Wilson characterized Urbia's medical records: "[N]one of these notes would be present-day criteria for proper medical documentation.  They just deal with [] very brief acute summaries of what was done.  There's really no review of [symptoms] present in any of these notes."  (R. at 683.)

subjective complaints is especially troubling since more organized and sophisticated records post-dating

her last date insured indicate that Urbia has consistently made extensive subjective descriptions of her

complaints to doctors and taken an active interest in unraveling the cause of her illness.  (See e.g., R. at

260-93.)  The first medical record to go into any detail about Urbia's complaints is Dr. Kind's July 5,

1990 examination.  (R. at 434-35.)  That record details a flood of subjective symptoms dating back to

1979: "Her ears rang.  She lost her voice for 4 months.  Her throat was sore.  She had a little fever. . . .

Since then, she has had headache, tiredness, a sensation of feeling cold and clammy, dyspeneic, sore

throat, cough, smells bother her.  Has significant achiness . . . that she can't allow her husband to allow

her husband to put his arms around her."  (R. at 29.)

Finally, the comments of Dr. Muller and Dr. Sahni can arguably be described as dismissive of

Urbia's complaints after just one visit  (R. at 325, 328), raising concerns about the depth and accuracy

of the accompanying notes of Urbia's complaints.

The Court also finds that it is significant that these early examinations precede the first definition

of CFS by five to nine years.  Any comments by Urbia concerning fatigue or headaches, for instance,

may not have been considered potentially relevant to diagnosing a broader syndrome that included as

symptoms a sore throat and other ailments.  As Dr. Wilson testified:

> So far as the comments about not mentioning about fatigue, et cetera, physicians often
> didn't even inquire about those symptoms in patients, and . . . the documentation at that
> time was not nearly as extensive as we do now in terms of covering [INAUDIBLE]. . . .
> I think you have to rely on a patient's history, and what we now know about these
> syndromes that we weren't asking the right questions, we often ignore—when chronic
> fatigue syndrome and fibromyalgia were first evolving as syndromes, they were—the
> medical profession were thought not to be real and disregarded, patients' complaints were
> ignored, and so its not unusual to see this in records from that time.

(R. at 682-83.)

Further, even given the abridged and inscrutable nature of many of the entries in Urbia's early medical records, medical evidence pointing to fatigue exists in the record. For example, on January 16, 1980, Dr. Mast prescribed "rest at home" as part of her treatment. (R. at 327.) On March 25, 1980, Dr. Mast advised Urbia, "Continue symptomatic Rx with increasing activity as tolerated." (Id.) On November 10, 1980, Dr. Mast noted, "She does seem somewhat weak." (R. at 324.)

Moreover, the pre-DLI medical record also provides some support for at least one of the medical symptoms most closely tied to CFS, a sore throat; throughout her early medical records Urbia complains of a sore throat (See R. at 300, 321-28). Additionally, in the same period of time, she also complains of at least seven of the "commonly observed symptoms in CFS" patients as enumerated by the CDC: adominal pain on September 25, 1980 (R. at 325) and on May 13, 1981 (R. at 324); dizziness on May 6, 1981 (R. at 324) as well as "mild vertigo" on August 25, 1980 (R. at 326); earaches on May 6, 1981 (R. at 324) and May 13, 1981 (R. at 324); anxiety on September 16, 1980 (R. at 325), November 10, 1980 (R. at 324), and July 22, 1982 (R. at 232); panic attacks on November 10, 1980 (R. at 324); shortness of breath on November 10, 1980 (R. at 324) and May 13, 1981 (R. at 324), and objectively documented weight loss of twenty-one pounds in the two years between September 25, 1980 and October 5, 1982 (See R. at 322, 325). Urbia also was diagnosed throughout this period as having pharyngitis, a symptom provided as an example of a medical sign establishing a medically determinable impairment in CFS patients.[7]

---

[7] The Court takes no stand on whether Urbia's pharyngitis was "nonexudative" as referenced in the Social Security regulations. SSR 99-2p, 64 Fed. Reg. at 23382, 1999 WL at *3. The Court

54

Considered apart from the record as a whole, the Court agrees that the above medical evidence, while perhaps pointing towards a CFS diagnosis, would not support a finding that Urbia had CFS.  There is more evidence to consider, however.  SSR 83-20 indicates that "when . . . the alleged onset date and the date last worked are far in the past and adequate medical records are not available. . . . it [is] necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process."  SSR 83-20, 1983 WL at *2.

C.      **Urbia's Work History, Retrospective Medical Opinions, and Subjective Complaints**

As noted above, the contemporaneous medical evidence must be considered in light of Urbia's work history, allegations, and the other medical and lay evidence in the record as a whole.  SSR 83-20 at 2.

1.      **Urbia's Work History**

The Commissioner contends that ALJ Kunz did not discredit Urbia based upon her work record but instead found her work record to be a neutral factor.  (Def.'s Mem. at 13.)  This assertion apparently infers that the ALJ found Urbia's "good work history prior to her alleged onset, which is consistent with her allegations" (a positive factor) to be cancelled out by Urbia's: (1) apparent "problem with her former work supervisor, which might have provided a non-medical reason for her stopping

_____

does, however, note that the list of medically determinable impairments listed in SSR 99-2p is not inclusive of all such impairments.  Id.  Further, the Court recognizes that, given the broken notations of Urbia's early medical records and given the types of medications she was taking at the time, such a determination may not be possible.  The limitations of this evidence does not, however, prohibit retrospective treating physicians from inferring the nature of the pharyngitis given the medical record as a whole.

work," and (2) her failure during the relevant period "to get vocational rehabilitation services" (negative

factors).  (R. at 29.)  The ALJ does not provide a cite to the record for the conclusion that Urbia had

"a problem" with her former work supervisor.  In the absence of a citation to the record, the Court

assumes the ALJ's statement is based upon the following exchange between the ALJ and Urbia at the

administrative hearing:

> ALJ:   So you'd been sick for a couple of months and just decided at that point that you
> weren't going to—you couldn't work any more?

> Urbia:  I could not.  I could not speak, and the head librarian was putting a lot of stress
> on me because I had to give book talks and children programs every Saturday,
> and you needed a voice and I could barely whisper.  And the headaches were
> really, really bad.

(R. at 702-03.)  The above excerpt does not indicate Urbia even had a conversation with her

supervisor, much less that some interpersonal "problem" existed.  Indeed, Urbia's response is clear, her

answer suggests she recognized the physical demands of the job included giving book talks, and she

realized that she could not physically perform her job because of her inability to speak other than in a

whisper.  Morever, nothing in the record suggests Urbia was fired as the result of some work

conflict—she quit because, she knew she "needed a voice" to perform her job and she could not

speak.[8]  The Court finds the above evidence supports, not detracts from, the ALJ's finding that Urbia

had a good work history prior to her quitting her job.

The ALJ also found that Urbia did not seek vocational rehabilitation treatment.  (R. at 29.)

Urbia's past relevant full-time work was as a secretary and children's librarian.  Urbia's experience

---

[8] Urbia provided similar testimony at the first administrative hearing.  (R. at 617-18.)

was that these jobs required the employee to be able to speak.  Prior to and immediately after she left her job, Urbia had sought treatment to restore her voice.  (See R. at 323, 327-28.)  From her claimed onset date through her date last insured, this condition was recurrent at best and never corrected, at worst.  That no doctor visits are recorded for a period following the notation, "Records to Mesaba Clinic, Chisholm," seems entirely consistent with Urbia's position that she continued treatment during this period, a position further supported by the medical records generated after the time gap that do exist.  It is not at all clear to this Court what vocational rehabiliation Urbia could have sought.  She experienced many of the same recurring symptoms throughout the period from her alleged onset through her DLI despite attempted treatment.  She was seeking diagnosis of an illness which would not be defined until 1988 and for which she would not receive a conclusive (retrospective) opinion until 1990 from Dr. Kind (R. at 434) and in 1992 from Dr. Wilson (R. at 300).  Urbia testified that to attend a conference prior to her date last insured, she "knew [she] had to rest for three days prior to that conference to rest up just to make it.  [She] took a visualization course at that time through the hospital with . . . Dr. Paul Couch [phonetic], and [she] would visualize [herself] getting out of bed and literally driving myself there and making it back."  (R. at 714.)  If her testimony is credible, it seems unlikely such a person would benefit from some kind of vocational rehabilitation treatment.

## 2.    Weight Given to Retrospective Treating Physician Opinions

The evidence also includes the retrospective testimony of Dr. Kind and Dr. Wilson that Urbia had CFS prior to her date last insured.  If not discounted, these opinions counter the ALJ's determination.

"[R]etrospective medical diagnoses uncorroborated by contemporaneous medical reports but corroborated by lay evidence relating back to the claimed period of disability <u>can</u> support a finding of past impairment." <u>Jones v. Chater</u>, 65 F.3d 102, 103 (8th Cir. 1995) (emphasis added); <u>Likes v. Callahan</u>, 112 F.3d 189, 190-91 (5th Cir. 1997) (per curiam) (adopting the rule of the Eighth Circuit and reversing where the ALJ did not consider medical evidence suggesting that the claimant, a Vietnam war veteran, suffered from post-traumatic stress disorder [PTSD] during his insured period although the medical evidence was not contemporaneous with the claimant's insured period).

In <u>Jones v. Chater</u>, 65 F.3d 102 (8th Cir. 1995), a Vietnam war veteran was discharged from the military in 1968 and his insured status ran out in 1975. <u>Id.</u> at 103. Upon discharge in 1968, a mental evaluation revealed occasional insomnia, bad dreams, and mild depression, but all were within the normal range. <u>Id.</u> The administrative record was "barren of any further medical reports mentioning mental problems until 1991, when Jones, upon learning of the existence of PTSD and recognizing many of its symptoms in himself, sought diagnosis and treatment for the condition." <u>Id.</u> Thereafter, three mental health professionals diagnosed Jones with PTSD and "while not squarely addressing the issue of onset date, impl[ied] that Jones was suffering from the disorder at the time his insured status expired in 1975." <u>Id.</u> The ALJ denied Jones benefits reasoning that "there was no medical evidence showing that the condition had arisen by 1975." <u>Id.</u> The Eighth Circuit, however, reversed and remanded because the ALJ failed to discuss "the provocative medical diagnoses suggesting an impairment during the insured period" and because the ALJ failed to discuss corroborating lay testimony. <u>Id.</u> at 104.

Here, ALJ Kunz considered the July 5, 1990 retrospective opinion of Dr. Kind that Urbia was a "young woman who was very active, became ill with a flu-like illness and has never been the same

since" and who "fits the chronic fatigue syndrome fairly well."  (R. at 434.)  The ALJ also considered

the September 13, 1999 retrospective opinion of Dr. Wilson that Urbia "became totally disabled from

her chronic fatigue syndrome in approximately 1979."  (R. at 429.)  Such medical evidence outside the

time period for which a claimant is insured can provide the basis for a disability determination even

though there is no medical evidence in the record contemporaneous with the insured period.  See

generally Jones, 65 F.3d at 103 (holding that medical evidence dated sixteen years after the date of last

insured was relevant for determining disability during the insured period).  Social Security Ruling 83-20

also recognizes that such retrospective opinions may be the basis for setting on onset date even "prior

to the date of the first recorded medical examination."  SSR 83-20, 1983 WL at * 3.

The ALJ, however, did not afford any weight to either Dr. Kind's or Dr. Wilson's retrospective

opinions. (R. at 28-30.)

The ALJ rejected Dr. Kind's opinion because Dr. Kind had "noted the claimant was in no

acute distress, and did not opine any treatment."  (R. at 28.)  First, the medical record comment cited

by the ALJ which indicates Urbia was  "in no distress" was authored on August 15, 1990 not by Dr.

Kind but by a fellow internal medicine physician, Dr. Glickstein.  (R. at 432.)  Second, on July 9, 1990,

Dr. Kind did prescribe ten to thirty m.g. of amitriptyline (R. at 434), an anti-depressant, which she was

still taking, in addition to aspirin and Bactrim, when she was examined by Dr. Glickstein on August 15,

1990 (R. at 432).  Dr. Kind prescribed the antidepressant to "see if it will help her achiness." (R. at

434.)  That Urbia's condition improved by the time Dr. Glickstein saw her—after the administration of

anti-depressant medication—actually bolsters a diagnosis of CFS.  Dr. Wilson testified, that "certain

symptoms" of CFS patients "will get better" upon administration of antidepressants.  (R. at 688-89.)

Her condition also improved after she took similar medications on other occasions as well, notably: July 26, 1982 after being prescribed Ativan on July 22, 1982 and October 19, 1982 after being prescribed Triavil on October 5, 1982.  (R. at 322.)

Third, the CDC recognizes, "[s]ince no cause for CFS has been identified and the pathophysiology remains unknown, treatment programs are directed at relief of symptoms, with the goal of the patient regaining some level of pre-existing function and well-being. . . . The health care provider, together with the patient, will develop an <u>individually tailored</u> program that provides the greatest benefit."  Centers for Disease Control and Prevention, <u>Chronic Fatigue Syndrome, Treatment of Patients with Chronic Fatigue Syndrome</u>, http://www.cdc.gov/ncidod/diseases/cfs/treat.htm (emphasis added).  The Court assumes that Dr. Kind, a physician that the first ALJ to hear this matter described as "an authority on chronic fatigue syndrome" (R. at 44) was capable of developing and, indeed as noted above, did develop, an individually tailored treatment program for Urbia given her CFS diagnosis in light of her other ailments and the treatments she was undergoing for those other ailments.  In light of the above discussion, the Court finds that the ALJ's rejection of Dr. Kind's opinion is not supported by substantial evidence in the record and finds that she erred in discrediting Dr. Kind's retrospective opinion that Urbia had CFS prior to her date last insured.

The ALJ stated, that she "[could ]not give any weight to the opinions and statements of Dr. William Wilson" because: (1) he first began treating Urbia in 1992; (2) his conclusion that Urbia has disabling CFS before her date last insured conflicted with the medical record in existence before her date last insured; and (3) his conclusion that Urbia was totally unable to work as of 1979 was inconsistent with his own statements that her condition was not fully defined in 1979 and worsened after

her date last insured.  (R. at 29-30.)

First, the Court rejects the idea that Dr. Wilson's opinion as to Urbia's onset date should not be given any weight because he first began treating Urbia after her date last insured.  Social Security Ruling 83-20 makes clear that an onset date determination may be made using medical evidence generated after the alleged date of onset.  <u>See</u> SSR 83-20, 1983 WL at *3 ("In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination.").  Where, as here, "the alleged onset date and the date last worked are far in the past and adequate medical records are not available. . . . it [is] necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process."  SSR 83-20, 1983 WL at *2.  The <u>Jones</u> court recognized that such retrospective opinions may opine about a claimant's condition even fourteen years prior to the date the retrospective opinion issues.  65 F.3d at 103.

Second, in the Eighth Circuit:

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  <u>See</u> <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991).  In fact, it should be granted controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  <u>See</u> <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).  By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  <u>Id.</u>

<u>Cunningham v. Apfel</u>, 222 F.3d 496, 502 (8th Cir. 2000); <u>see</u> <u>Lauer v. Apfel</u>, 245 F.3d 700, 705 (8th Cir. 2001); <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000); <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).  As noted above, it is <u>necessary</u> under the particular facts of this case to infer Urbia's

onset date using medical records generated after her DLI.

There is ample support in the record for Dr. Wilson's and Dr. Kind's diagnoses of CFS subsequent to Urbia's DLI.  Without going into great detail, Urbia's medical record as of the date of the administrative hearing established that Urbia had severe fatigue lasting six months or longer.  Dr. Kind's testing in 1990 ruled out other known causes of this fatigue.  (R. at 196.)  Furthermore, Urbia has never been diagnosed with any of the "known" causes of fatigue referenced by the Social Security Administration.  SSR 99-2p, 64 Fed. Reg. at 23381, 1999 WL at *1 (citing Dr. Keiji Fukuda, et. al, The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study, 121 Annals of Intern. Med. 953, 953-59 (1994)).  Given the above, Dr. Wilson also properly relied on Urbia's statements about her pre-DLI fatigue.  See Delgehausen v. Barnhart, No. Civ.03-4124 (ADM/SRN), 2004 WL 1922126, *3 (D. Minn. Aug. 27, 2004) (noting that the treating physician "reasonably relied on [p]laintiff's self-reports in evaluating her chronic fatigue syndrome because determining the severity of an individual's fatigue often eludes objective measurement" and citing Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994)).

She also has had a number of the suspect symptoms—sore throat, muscle pain, headaches of a new type, pattern or severity, unrefreshing sleep, and post-exertional malaise lasting more than 24 hours—concurrently.  See Part I.B.1.b, herein.  Moreover, Urbia has been diagnosed with many of the other commonly observed symptoms of CFS such as abdominal pain, alcohol intolerance, chest pain, diarrhea, dizziness, earaches, nausea, night sweats, anxiety, depression, panic attacks, shortness of breath, skin sensations, tingling sensations, and weight loss, to name a few.  See id.; Center for Disease Control and Prevention, Chronic Fatigue Syndrome, What is CFS?.  Dr. Wilson gave detailed

testimony at the administrative hearing as to how the records in existence before Urbia's DLI, given his

retrospective diagnosis of CFS, supported adopting Urbia's alleged onset date.

"[W]hen evaluating a claim of CFS, lack of objective medical evidence has less significance and

may be seen as normal rather than aberrational." Gamradt v. Barnhart, Civ.No. 01-2205 (ADM/RLE),

2003 WL 1571567, *2 (D. Minn. May 10, 2003) (citing Cook v. Liberty Life Assurance Co. of

Boston, 320 F.3d 11, 21 (1st Cir. 2003)).  Dr. Wilson testified that based upon Urbia's current

diagnosis, he could infer from reviewing the medical records prior to her DLI that her onset date was as

she alleged.  Specifically, he testified that Urbia's history of positive mononucleosis tests was significant

in his determination.  (R. at 682.)  Social Security Ruling 99-2p indicates that an elevated antibody titer

to Epstein-Barr virus capsid antigen may be a sign of a medically determinable impairment in an

individual with CFS.  See SSR 99-2p, 64 Fed. Reg. at 23382, 1999 WL at * 3.[9]  Dr. Wilson also

explained that Urbia's alleged complaints of headaches and fatigue would not be in her records in large

part because of her CFS—that is, because she presented with anxiety, symptoms of depression, and a

sore throat that did not respond well or consistently to the standard treatments of the day.  (R. at 682-

83; 686-87.)  Further, assuming they are credible, Dr. Wilson was entirely justified in basing his

decision in part on Urbia's subjective descriptions of her pre-DLI condition and symptoms.  See SSR

83-20, 1983 WL at *4.

---

[9] The presence of a specific virus ratio establishes the existence of a medically determinable impairment in individuals with CFS.  SSR 92-2p, 64 Fed. Reg. at 23382, 1999 WL at *3.  It is not clear from the record if Urbia met these thresholds during the relevant time period.  But SSR 99-2p also provides that "[a]ny other laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record" can constitute medically determinable impairments.  Id.

Finally, that Dr. Wilson found Urbia's condition to be one that worsened after her DLI and one that was difficult to define, detracts little from his overall opinion.  If anything, it supports a favorable credibility finding.  CFS is difficult to define almost by definition.  For example, determining chronic fatigue caused by CFS is largely a process of elimination and exclusion as is witnessed by the CDC's own literature.  <u>See</u> Part V.A., herein.  Moreover, the Social Security's own regulations recognize that some conditions take some time to properly diagnose.  <u>See</u> SSR 83-20, 1983 WL at * 2-*4; <u>see also</u> <u>Jones</u>, 65 F.3d at 103-04.

In sum, the Court finds that it is of no consequence that Dr. Wilson first treated Urbia after her DLI and also finds that Dr. Wilson's opinion was <u>not</u> inconsistent with the medical record in existence prior to January 1, 1985 or his other statements.  Thus, the ALJ erred in discrediting Dr. Wilson's opinion that Urbia had CFS prior to her DLI and as of her claimed date of onset.

### 3.      Dr. Hiduchenko's and Other Non-Treating Physician Opinions

Unlike the opinions of Dr. Kind and Dr. Wilson, Dr. Hiduchenko's medical opinion appears to have been circumscribed by her interpretation of the interrogatory posed to her.  She rejected a CFS diagnosis prior to Urbia's DLI in part because "fatigue" was not mentioned in the pre-DLI records.  (R. at 444.)  This is a correct statement of the record.  As explained by Dr. Wilson, there are, however, "depression" diagnoses in the record, which, given the medical record as a whole, allows one to infer the existence of chronic fatigue in the pre-DLI records.  Moreover, as noted above, Dr. Mast did prescribe "rest at home" in January of 1980.  (R. at 327.)  Dr. Mast also  noted that Urbia could increased activity "as tolerated" in March of 1980 (<u>Id.</u>), suggesting that there had been and remained an

underlying but unrecorded decrease in activity and some concern about a return to normalcy.  Dr. Mast also observed that Urbia was "somewhat weak" in November of 1980.  (R. at 324.)  In addition, the pre-DLI records must be considered in light of the lack of a universally accepted definition for CFS (or a name, for that matter) before 1988.  Given the above, the Court finds that the ALJ erred in affording the "greatest weight" (R. at 29) to Dr. Hiduchenko's non-examining opinion.  The Court finds that Dr. Hiduchenko's opinions should have been given considerably less weight for the above reasons.

The ALJ's decision also makes reference to the state agency medical determinations, which were used along with Dr. Hiduchenko's opinion to discredit Dr. Wilson's opinion.  (R. at 30.)  These determinations were made by a specialist in internal medicine and another specialist in psychology.  (R. at 409-19.)  Neither specialist found Urbia had any severe impairment, either physical or mental, prior to her DLI.  (Id.)  These conclusions are directly contrary to the ALJ's own determination that Urbia suffered from severe respiratory infections.  (R. at 30.)  The ALJ properly granted these opinions less weight as a result.  (Id.)

### 4.    Credibility Determination of Urbia's Subjective Complaints

Finally, Urbia testified that she did have contemporaneous chronic fatigue in addition to substantial headaches of a new type, unrefreshing sleep, and post-exertional malaise lasting more than 24 hours.  (See R. at 617-41; 702-14.)  If her credibility is not discounted, her testimony, and that of the other lay witnesses, would drastically undermine the position taken by the ALJ.

Credibility determinations must be supported by substantial evidence in the record as a whole.  See Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

> In order to properly evaluate a claimant's subjective complaints of pain, the ALJ is required to make a credibility determination by taking into account the following factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional limitations. Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.

Hutton v. Apfel, 175 F.3d 651, 654-55 (8th Cir. 1999) (citation omitted). These factors are often referred to as the Polaski factors, after the case in which they were first articulated, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

"The ALJ may discount subjective complaints of pain (and other symptoms) if inconsistencies are apparent in the record as a whole." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). In other words, the ALJ can properly discredit a claimant's subjective complaints or symptoms if they are inconsistent with other evidence of record. But "[i]f an ALJ rejects a claimant's testimony regarding pain, he must make an express credibility determination detailing his reasons for discrediting the testimony." Prince v. Bowen, 894 F.2d 283, 286 (8th Cir. 1990) (emphasis added); see also Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991) ("An ALJ who rejects a claimant's complaints . . . must make an express credibility determination explaining his reasons for discrediting the complaints."). If an ALJ does not explain why he rejected a claimant's subjective complaints, a reviewing court cannot tell whether his determination was properly made. Sorich v. Shalala, 838 F. Supp. 1354, 1361 (D. Neb. 1993) ("Without a serious discussion of the Polaski factors in relationship to whatever inconsistencies the ALJ may find, a reviewing court is left in the dark as to why the ALJ chose to disbelieve the claimant.").

Since CFS is commonly diagnosed on a symptomatic basis rather than by the

application of objective medical testing, the subjective representations of a claimant take on special significance as do the corresponding credibility assessments of the ALJ. The appraisal of the debilitating impact of CFS has proved as nettlesome to the medical community, as it has to the Courts which have been called upon to review a claimant's entitlement to benefits for a CFS-generated disability. Almost invariably, the crux of the Court's decision balances on the ALJ's credibility assessments.

Dornack v. Apfel, 49 F. Supp. 2d 1129, 1140 (D. Minn. 1999) (citations omitted). Evidence from lay persons, including any medical sources who are not acceptable medical sources for the purpose of establishing the existence of a medically determinable impairment but who have provided services to the claimant, may be very useful in deciding the claimant's credibility. See SSR 99-2p, 64 Fed. Reg. at 23384, 1999 WL at * 8 ("Third-party information, including evidence from medical sources who are not acceptable medical sources for the purpose of establishing the existence of a medically determinable impairment, but who have provided services to the individual, may be very useful in deciding the individual's credibility.")

The ALJ stated that she discounted Urbia's subjective complaints because Urbia testified that, before her DLI, she cared for minor children, including a mentally handicapped child, helped with schoolwork, taught religious classes two times per week, took some classes, and wrote a children's book. (R. at 29.) The ALJ also cited a report that Urbia worked as an assistant cross-country coach in 1990. (Id.) The Court does not find that these are persuasive reasons for discounting Urbia's testimony. First, some of Urbia's testimony about assisting her children pertained to the period when she first got sick until she quit work (her onset date). (R. at 703-04.) This testimony is only useful for determining how Urbia's condition changed after her onset date. In fact, Urbia testified that on a "typical day" after her onset date, she did not assist the children, who were approximately ten and

twelve years old (R. at 703), in getting ready for school or preparing their breakfast, but, instead, would ask her husband for aspirin to alleviate headache and body pain.  (R. at 635.)  Second, Urbia co-taught classes which were only forty minutes long, twice a week, and Urbia testified that she missed "at least half" of the classes.  (R. at 629, 639.)  Third, Urbia did sign up for some community classes with her husband but stated that "he usually went by himself" because she was not physically able to attend.  (R. at 638.)  Fourth, there is little evidence about the book Urbia wrote other than it was "a little children's book."  (R. at 707.)  It is difficult to assess how writing such a "little" book, without more information, would detract from Urbia's other statements.  Finally, on the one occasion the medical records reflect Urbia saw Dr. Glickstein, the record reads, in part: "She currently is working as an assistant cross-country coach."  (R. at 432.)  This statement is the only such reference to Urbia working after her onset date anywhere in the record by a physician who may have only seen Urbia once.  Elsewhere in the record, Dr. Wilson testified that Urbia's husband was a cross-country coach, apparently at a middle school in Chisholm, Minnesota.  (R. at 689; see also R. at 170.)  Under the circumstances, the Court does not assign the same importance the ALJ did to Dr. Glickstein's entry indicating Urbia was "working."  In fact, both ALJ Cordek and ALJ Kunz determined that Urbia did not engage in substantial gainful activity after her alleged onset date.  (R. at 31, 52-53.)  Given the record as a whole, the Court does not find that the above evidence detracts from the credibility of her other statements.

Urbia's subjective symptoms were also corroborated by others.  Her husband testified that by November of 1979 Urbia was not able to get up to get the kids off to school.  (R. at 648.)  He testified that he and Urbia's mother did most of the daily household chores "because she just wasn't moving."

(Id.)  Urbia's stepson also testified that Urbia was "always . . . tired and needing to take naps" and that he also helped with many of the household tasks.  (R. at 654-55.)  Her stepdaughter's teacher (and husband's colleague) explained that Urbia had difficulty scheduling parent/teacher conferences because of her health—Urbia had "significant weight loss" and "was continually tired."  (R. at 170.)  The teacher wrote that during the early 1980s Urbia was "emaciated and haggard."  (Id.)  Both ALJs found the above statements to be "sincere" (R. at 26, 45) but ALJ Kunz discounted them, stating, "there is no evidence that any of these persons is medically qualified to document the existence of medically determinable impairments."  (R. at 26.)  The ALJ's comments lose sight of the direction given by SSR 83-20 and Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995) to consider lay testimony when determining, on facts such as these, whether a claimant has a medically determinable impairment.  As such, the ALJ erred by discounting the above lay testimony.

Based upon the above, the Court finds that the ALJ erred in finding that there were inconsistencies in the record sufficient to warrant discrediting Urbia's subjective symptoms.

### D.   Severity of Urbia's Condition and the Hypothetical Posed to the Vocational Expert

Dr. Wilson testified that "typically at the onset of [CFS] . . . the symptoms are generally very severe right away. . . . they don't come on gradually."  (R. at 696.)  He explained persons with CFS have good and bad days but would have difficulty in a structured work setting.  (Id.)  Dr. Wilson opined that Urbia had "one of the more severe cases" of CFS that he had seen.  (R. at 686-87.)  On September 13, 1999, he opined that Urbia "became totally disabled from her chronic fatigue syndrome in approximately 1979. . . . The combination of [her] problems has rendered her completely unable to

work since 1979." (R. at 429.)

Urbia testified that her CFS impairments were disabling to the point that her typical day involved combating the effects of severe headache and body pain, fatigue, and difficulty speaking due to recurrent sore throats, among other ailments. (See R. at 617-41; 702-14.) Further, even Dr. Hiduchenko's limited view of the record found that Urbia would require limited exposure to dust, fumes, odors, chemicals, and gases. (R. at 449.) Dr. Wilson concurred. (R. at 452.) Dr. Hiduchenko did not indicate, despite the specific question on the assessment form, how these environmental factors impaired Urbia. (R. at 449.) Urbia's husband, whose testimony both ALJs described as "sincere" (R. at 26, 45), testified that Urbia's chemical sensitivity started in their first year of marriage—1979. (R. at 650.) He testified that when exposed to new carpeting and some wood furniture she would get headaches with dizziness and her voice would be affected. (Id.) Her condition was bad enough that she wore a charcoal mask and was unable to be in their remodeled house for six months. (Id.)

In assessing Urbia's residual functional capacity, ALJ Cordek found that Urbia suffered from some difficulty concentrating and maintaining social functioning due to her pre-DLI depression diagnosis. (R. at 46.) The hypothetical person posed to the vocational expert in the first hearing was limited to four to five-step operations. (R. at 51, 661.) As a result, the vocational expert at the first hearing found Urbia could not work her past relevant work. (R. at 661.) ALJ Kunz, however, found no such cognitive limitation, did not so limit Urbia, and the vocational expert found Urbia could perform her past relevant work. (R. at 723-25.) The Court finds that Urbia's pre-DLI diagnoses of and treatments for anxiety and depression (R. at 322-25), along with Dr. Wilson's mental functional capacity assessment (R. at 453-54), and Urbia's and the other lay testimony (R. at 170, 617-41, 648,

654-55, 702-14), requires that Urbia's residual functional capacity be limited at least as much as that identified by ALJ Cordek.  As a result the hypothetical posed to the vocational expert did not accurately reflect Urbia's residual, pre-DLI cognitive abilities.  The ALJ also erred in not including any references in the hypothetical to Urbia's recurrent and contemporary problems with her voice as ALJ Cordek had done.  (R. at 660-64.)  The Court finds, that given the results of the hypothetical at the first administrative hearing, a hypothetical with the cognitive limitations and speech limitations described above would have resulted in a finding that Urbia could not perform her past relevant work.  At that point the disability burden of proof would have shifted to the Commissioner who would have had to prove that Urbia is not disabled within the meaning of the Social Security Act by showing she could perform work that exists in substantial numbers in the national economy.  See Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Talbott v. Bowen, 821 F.2d 511, 514-15 (8th Cir. 1987).

Given the great weight that should be afforded Dr. Kind's and Dr. Wilson's opinions, the little weight that should be afforded the non-treating physicians, the uncontroverted lay testimony, the pre-DLI medical record, and the inferences that can be drawn from the post-DLI medical record, the Court finds that the hypothetical posed to the vocational expert significantly overstated Urbia's functional capacity prior to her DLI.  The Court finds that the limitations set forth in Dr. Wilson's functional capacity assessment are valid and a more proper measure of Urbia's pre-DLI abilities.  Dr. Wilson's functional assessment reflects Urbia's real world "'ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)).  It also recognizes that Urbia has good and bad days,

a recognition required for a proper vocational assessment.  See e.g., Dornack, 49 F. Supp. at 1141

("Quite clearly, if the Plaintiff's testimony is credited, her prospect of enduring substantial gainful activity

would be dim, particularly on her 'bad' days.")

Dr. Wilson assessed that Urbia could only sit four hours and stand and/or walk two hours in an

eight-hour work day and could never climb, balance, crouch, stoop, kneel, and crawl and had cognitive

and environmental exposure limitations.  (R. at 450-52.)  ALJ Kunz concluded that there was no point

in posing such a hypothetical person to the vocational expert because it would run afoul of Social

Security Ruling 96-8p, which states:

> Ordinarily, [residual functional capacity (RFC)] is the individual's maximum remaining
> ability to do sustained work activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a discussion of the individual's
> abilities on that basis.  A "regular and continuing basis" means 8 hours a day, for 5 days
> a week, or an equivalent work schedule.

SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996), available at 1996 WL 374184, at *1 and

http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html#fnr2 (last visited August 2, 2005).

The Court agrees that the application of Ruling 96-8p to Urbia's residual functional capacity as set forth

by Dr. Wilson would eliminate her from all competitive work.

## VI.    RECOMMENDATION

When the Commissioner improperly denies a plaintiff benefits, the reviewing court normally

remands the case to the ALJ for further administrative proceedings.  Ingram v. Barnhart, 303 F.3d 890,

895 (8th Cir. 2002) (citation omitted).  But courts may remand and order an award of benefits if the

evidence overwhelmingly supports a finding of disability.  Id.; see Buckner v. Apfel, 213 F.3d 1006,

1011 (concluding that the court may reverse the Commissioner's denial and award benefits outright if overwhelming evidence proves the plaintiff is disabled).  In reviewing the administrative record for "overwhelming evidence," courts should consider the following factors: (1) the ALJ's credibility findings; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints relating to exertional and nonexertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts, when required, based upon a proper hypothetical question setting forth the plaintiff's impairments.  See Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (internal quotation omitted).

Based upon the above, the Court finds that the ALJ's determination that Urbia was not entitled to disability benefits was not supported by substantial evidence in the record as a whole.  In fact, the Court finds that overwhelming evidence exists to support Urbia's claim that she was disabled as defined by the Social Security Act as of her alleged onset date of October 31, 1979.

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1.    Plaintiff's Motion for Leave to file Excess Pages (Doc. No. 25) be

      **GRANTED**.

2.    Defendant's Motion for Summary Judgment (Doc. No. 22) be **DENIED.**

3.    Plaintiff's Motion for Summary Judgment (Doc. No. 17) be **GRANTED**; and

4.    The Commissioner's decision be **REVERSED** and the matter be

      **REMANDED** for an award of benefits to Plaintiff based upon a disability

      onset date of October 31, 1979.


Dated: August 2, 2005

                                        __s/ Susan Richard Nelson__

                                        SUSAN RICHARD NELSON
                                        United States Magistrate Judge


Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 16, 2005, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.